IN THE UNITED STATES DISTRICT COURT FOR THE
MIDDLE DISTRICT OF TENNESSEE
NASHVILLE DIVISION

| | |
|---|---|
| JAMES BEARDEN AND SHEILA BEARDEN, individually and on behalf of all others similarly situated, | ) ) ) ) |
| Plaintiffs, | ) ) |
| v. | ) ) |
| HONEYWELL INTERNATIONAL INC., | ) ) |
| Defendant. | ) |

Case No. 3:09-01035
Judge Trauger

## MEMORANDUM

Pending before the court is the Motion to Dismiss and Motion to Strike filed by

defendant Honeywell International Inc. (Docket No. 9), the plaintiffs' response (Docket No. 18),

and the defendant's reply (Docket No. 20).  For the reasons discussed below, the defendant's

motion will be granted in part and denied in part.

## BACKGROUND

On May 8, 2008, plaintiffs James and Sheila Bearden moved into a newly constructed

home in Nashville, Tennessee that had been built to their specifications.[1]  Two model F300

electronic air cleaners, manufactured by Honeywell International Inc. ("Honeywell"), were

installed in the house's heating system.

The plaintiffs allege that they "were advised by Mr. Daryl Bennett of Lebanon Heating

_____

[1] Unless otherwise noted, the allegations are drawn from the plaintiffs' Class Action
Complaint (Docket No. 1).

1

and Air that it would be beneficial to run these electronic air cleaners in the 'on' position for a month or so after moving in to help better clear the air." (Docket No. 1 ¶ 9.) Although Bennett "discussed the benefits of the F300," he did not "provide information about the negative health effects associated with ozone gas, which was produced by the F300." (*Id.* ¶¶ 9, 57.)

The plaintiffs allege that, within days of moving in, Sheila Bearden ("Bearden") developed a respiratory illness. Over the next several months, she suffered sore throats, coughing, fatigue, and other troubling symptoms. She saw multiple doctors, but their diagnoses and treatments were ineffective.

By November 2008, Bearden had allegedly developed a hypersensitivity to smells and everyday chemicals. This became so severe that she "could not shop in most stores without feeling intense pain and could not use or be near certain cosmetics or other chemicals." (*Id.* ¶ 39.) She "experience[d] pain while working at the computer and talking on the phone," and it became difficult for her to spend time in the house. (*Id.*) The plaintiffs allege that, in six months, Bearden went from being a healthy and active person to being "filled with pain, fear and anxiety." (*Id.* ¶ 42.)

On or around November 18, 2008, while searching for information about air contaminants, Bearden read that electronic air cleaners can contribute to poor indoor air quality. At that point, the plaintiffs permanently turned off their air cleaners. Bearden's health problems continued, however, and she and her husband were forced to move out of their house for several months. The plaintiffs allege that Bearden's symptoms have "lessened to some degree since she turned off her air cleaners," although she continues to suffer from hypersensitivity to "colognes,

2

cleaning supplies, plastics, fuel, fabrics, printed materials and other products containing chemicals that are a part of everyday life." (*Id.* ¶¶ 54-55.)

According to the plaintiffs, Bearden's health problems were caused by the ozone emitted by the defendant's product. Ozone, which is a molecule consisting of three oxygen atoms, is emitted by certain types of electronic air cleaners, including the F300. The plaintiffs allege that "[o]zone exposure has long been a recognized cause of breathing difficulties and chemical hypersensitivity of the sort experienced by Ms. Bearden." (*Id.* ¶ 72.)

In support of this contention, the Complaint cites, among other documents, an online Indoor Air Quality report published by the Environmental Protection Agency. That report notes that people vary in their sensitivity to ozone and that "[r]elatively low amounts can cause chest pain, coughing, shortness of breath, [and] throat irritation." Ozone Generators that are Sold as Air Cleaners, *available at* http://www.epa.gov/iaq/pubs/ozonegen.html. Other cited documents state that ozone inhalation can cause lung damage. The plaintiffs allege that this effect was magnified because Bearden exercised indoors, slept within 60 inches of a vent that distributed air from the air cleaners, and owned certain products, including cosmetics, that reacted with ozone to release air contaminants.

The product data sheet distributed with the F300 claims that the air cleaner "contributes .005 to .010 ppm [parts per million] of ozone to the indoor air." (*Id.* ¶ 60.) This equates to 5 to 10 parts per billion (ppb). The document also notes that "[t]he U.S. Food and Drug Administration and Health and Welfare Canada recommend that indoor ozone concentration

3

should not exceed .050 ppm," or 50 ppb.[2]  (*Id.*)  The plaintiffs allege that the defendant has

understated the amount of ozone produced by the F300.  They point to a study published by the

magazine *Consumer Reports* that found that the F300 actually generates ozone levels of between

25 and 50 ppb.

The plaintiffs allege that the defendant's failure to truthfully label its product led to

Bearden's health problems.  They assert claims for: (1) strict liability for failure to warn; (2)

negligent failure to warn; (3) fraudulent concealment (styled as "fraud by omission"); (4) fraud;

(5) violation of the New Jersey Consumer Fraud Act; (6) negligent misrepresentation; (7) breach

of implied warranties under New Jersey statutes; (8) violation of the Magnuson-Moss Warranty

Act; and (9) unjust enrichment.

In addition to their individual claims, the plaintiffs have asserted Claims 3 through 9 on

behalf of a putative class.  The class includes customers who "were damaged as a result of

purchasing F300's [sic] which generated higher levels of ozone gas than Honeywell had

represented."  (Docket No. 1 ¶ 98.)  Specifically, the plaintiffs seek "the recovery of

consideration that . . . members of the Class paid to purchase the F300's [sic]."  (*Id.* ¶ 99.)  But

the proposed class expressly excludes "anyone other than Plaintiffs seeking to recover for

physical injuries caused by F300's [sic]."  (*Id.* ¶ 95.)

## ANALYSIS

The defendant has filed a Motion to Dismiss All Claims and Motion to Strike Class

---

[2] The plaintiffs allege that the defendant manufactures certain air cleaners, called High
Efficiency Particle Arresting, or HEPA, cleaners, that do not emit any ozone.

4

Allegations, pursuant to Federal Rules of Civil Procedure 12(b)(6) and 12(f).

## I. Motion to Dismiss Standard

The Federal Rules of Civil Procedure require plaintiffs to provide "a short and plain statement of the claim showing that the pleader is entitled to relief." Fed R. Civ. P. 8(a)(2). In deciding a motion to dismiss under Rule 12(b)(6), the court will "construe the complaint in the light most favorable to the plaintiff, accept its allegations as true, and draw all reasonable inferences in favor of the plaintiff." *Directv, Inc. v. Treesh*, 487 F.3d 471, 476 (6th Cir. 2007); *Inge v. Rock Fin. Corp.*, 281 F.3d 613, 619 (6th Cir. 2002). The court must assume that all of the factual allegations are true, even if they are doubtful in fact. *Bell Atlantic Corp. v. Twombly*, 550 U.S. 544, 555 (2007). In contrast, legal conclusions are not entitled to the assumption of truth. *Ashcroft v. Iqbal*, __ U.S. __, 129 S. Ct. 1937, 1950 (2009).

Generally, a complaint does not need to contain "detailed factual allegations," although its allegations "must be enough to raise a right to relief above the speculative level." *Twombly*, 550 U.S. at 555. "Blanket assertions" or a "formulaic recitation of the elements of a cause of action" are not sufficient. *Twombly*, 550 U.S. at 555, 556 n.3. In other words, "a complaint must contain sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'" *Iqbal*, 129 S. Ct. at 1949 (quoting *Twombly*, 550 U.S. at 570). The factual allegations must "allow[] the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Id.* at 1949-50. This is a "context-specific task that requires the reviewing court to draw on its judicial experience and common sense." *Id.* at 1950.

A higher pleading standard applies to claims of fraud. When alleging fraud, "a party

must state with particularity the circumstances constituting fraud." Fed. R. Civ. P. 9(b). This requires allegations about "the time, place, and content of the alleged misrepresentation . . . ; the fraudulent intent of the defendants; and the injury resulting from the fraud." *United States ex rel. SNAPP, Inc. v. Ford Motor Co.*, 532 F.3d 496, 504 (6th Cir. 2008) (citation omitted). Rule 9(b), however, "should be interpreted in harmony with Rule 8's statement that a complaint must only provide 'a short and plain statement of the claim' made by 'simple, concise, and direct allegations.'" *Id.* at 503. The key consideration is whether the complaint gives the defendant fair notice of the fraud claim and enables the defendant to prepare a responsive pleading. *Id.* at 504.

## II.    Failure to Warn Claims

The defendant argues that the failure to warn claims must be dismissed because the plaintiffs have failed to sufficiently plead that the air cleaners were unreasonably dangerous or that they caused Bearden's injuries.

These claims fall under the Tennessee Products Liability Act ("TPLA"), Tenn. Code Ann. § 29-28-101 *et seq.*, which governs manufacturers' and sellers' liability "for any injury to a person or property caused by [a] product." *Id.* § 29-28-105(a); *see also id.* § 29-28-102(6). Generally, a product liability claim requires a plaintiff to show that "(1) the product was defective and/or unreasonably dangerous, (2) the defect existed at the time the product left the manufacturer's control, and (3) the plaintiff's injury was proximately caused by the defective product."[3] *Sigler v. Am. Honda Motor Co.*, 532 F.3d 469, 483 (6th Cir. 2008) (citation omitted);

---

[3] More specifically, to recover on a failure to warn theory, the plaintiff must show that: "(1) the warnings at issue were defective; (2) the defective warning made the product unreasonably dangerous; and (3) the inadequate labeling proximately caused the claimed injury."

6

*see also* Tenn. Code Ann. § 29-28-105(a) (limiting manufacturers' liability to cases where the product is "in a defective condition or unreasonably dangerous"). "'[T]he general rule in Tennessee is that the issue of whether a product is defective or unreasonably dangerous is one for the jury.'" *Sigler*, 532 F.3d at 484 (quoting *Jackson v. Gen. Motors Corp.*, 60 S.W.3d 800, 805 (Tenn. 2001)).

Tennessee courts employ two tests for determining whether a product is unreasonably dangerous: the prudent-manufacturer test and the consumer-expectation test. *See* Tenn. Code Ann. § 29-28-102(8). "These two tests are not exclusive of one another, and either or both are applicable to claims of unreasonably dangerous products." *Brown v. Crown Equip. Corp.*, 181 S.W.3d 268, 282 (Tenn. 2005). The prudent-manufacturer test, which requires "a risk-utility balancing of a number of factors," *id.* at 282-83, allows liability if "the product because of its dangerous condition would not be put on the market by a reasonably prudent manufacturer or seller, assuming that the manufacturer or seller knew of its dangerous condition." Tenn. Code Ann. § 29-28-102(8). The consumer-expectation test "'simply requires a showing that the

_____

*Lee v. Metro. Gov't of Nashville & Davidson County*, 596 F. Supp. 2d 1101, 1127 (M.D. Tenn. 2009) (citations omitted); *see also Massey Seating Co. v. 200 Easley Bridge Rd. Corp.*, 1985 Tenn. App. LEXIS 3166, at *5 (Tenn. Ct. App. Sept. 25, 1985) (discussing negligent failure to warn and noting that "[a] manufacturer has a duty to warn its customers of hidden and unknown dangers in its products"). "Generally, courts considering the adequacy of product warnings consider: (1) whether the warning adequately indicates the scope of the danger; (2) whether it communicates the seriousness of the harm that could result from misuse; (3) whether the physical aspects of the warning alert a reasonably prudent person to the danger; and (4) the means used to convey the warning." *Lee*, 596 F. Supp. 2d at 1127.

A manufacturer has no duty to warn regarding dangers that are "apparent to the ordinary user." Tenn. Code Ann. § 29-28-105(d).

product's performance was below reasonable minimum safety expectations of the ordinary consumer having ordinary, 'common' knowledge as to its characteristics.'" *Sigler*, 532 F.3d at 483-84 (quoting *Jackson*, 60 S.W.3d at 806).

The defendant argues that the plaintiffs have not pleaded facts sufficient to satisfy either test. In its brief, Honeywell discusses at length the supporting documents cited in the Complaint. For example, the defendant points out that the *Consumer Reports* article, which found that the F300 creates ozone levels of 25-50 ppb, (1) concedes that the study had methodological limitations and (2) states that, at the 25-50 ppb range, there is no evidence of harm to ordinary consumers. (Docket No. 10 at 8; Docket No. 20 at 2.) Similarly, the defendant discusses various health studies and argues that exposure to 25-50 ppb of ozone is not enough to cause medical problems. (Docket No. 10 at 8-10; Docket No. 20 at 2-3.)

These arguments, however, are not appropriate at the motion to dismiss stage. The plaintiffs, who continuously ran two F300 air cleaners, have alleged that one F300 produces up to 50 ppb of ozone. The defendant's own product data sheet states that the FDA recommends that indoor ozone concentration should not exceed 50 ppb. Given that some level of ozone already exists in the ambient air,[4] the plaintiffs have alleged facts sufficient to show that the air cleaners caused their home's ozone levels to exceed the FDA-suggested maximum. This is enough, at this stage, to support their claim that a prudent manufacturer would not have sold the product.

_____

[4] For example, the defendant has attached and cited a document showing that ambient ozone levels in Nashville's outdoor air exceed 75 ppb. (*See* Docket No. 11, Ex. 2 at 2-3.)

8

Furthermore, the plaintiffs have sufficiently alleged that exposure to this amount of ozone caused Bearden's health problems. The defendant does not contest that ozone exposure can be unhealthy. Instead, the defendant's argument focuses on the level of exposure that is required to cause illness – i.e., whether 25 ppb, 50 ppb, 100 ppb, or 500 ppb is the minimum threshold to cause the injuries that the plaintiff has allegedly suffered. In Tennessee, causation in fact is generally a jury question, *see Hale v. Ostrow*, 166 S.W.3d 713, 718 (Tenn. 2005), and it is clear that resolution of the scientific question here will require expert testimony. The court will not, on a motion to dismiss, conduct a *Daubert*-style inquiry into the plaintiffs' theory of medical causation.

In sum, the court finds that the plaintiffs have pleaded "factual matter, accepted as true," sufficient to state failure to warn claims that are "'plausible on [their] face.'" *Iqbal*, 129 S. Ct. at 1949 (quoting *Twombly*, 550 U.S. at 570).

## III.    Common-Law Fraud Claims

Next, the defendant argues that the plaintiffs have failed to plead reliance, as required for their common-law fraud, fraudulent concealment, and negligent misrepresentation claims.

Under Tennessee law, reliance is an element of all three claims. To state a claim for fraud, a plaintiff must show that:

> 1) the defendant made a representation of an existing or past fact;
> 2) the representation was false when made; 3) the representation
> was in regard to a material fact; 4) the false representation was
> made either knowingly or without belief in its truth or recklessly;
> 5) *plaintiff reasonably relied on the misrepresented material fact*;
> and 6) plaintiff suffered damage as a result of the
> misrepresentation.

Case 3:09-cv-01035   Document 24   Filed 03/24/10   Page 9 of 22 PageID #: 763

*Walker v. Sunrise Pontiac-GMC Truck, Inc.*, 249 S.W.3d 301, 311 (Tenn. 2008) (citation omitted and emphasis added); *see also Security Fed. Sav. & Loan Ass'n v. Riviera, Ltd.*, 856 S.W.2d 709, 712 (Tenn. Ct. App. 1992) ("False representations alone, however, will not affect the validity of a transaction. The purchaser must have relied on the misrepresentations . . . .") (citation omitted).

Similarly, to show negligent misrepresentation, the plaintiff must show that the "plaintiffs justifiably relied on the information" communicated by the defendant. *Walker*, 249 S.W.3d at 311. Fraudulent concealment has the same requirement: "'[T]he tort of fraudulent concealment is committed when a party who has a duty to disclose a known fact or condition fails to do so, and another party *reasonably relies* upon the resulting misrepresentation, thereby suffering injury.'" *Shah v. Racetrac Petroleum Co.*, 338 F.3d 557, 571 (6th Cir. 2003) (quoting *Chrisman v. Hill Home Dev., Inc.*, 978 S.W.2d 535, 538-39 (Tenn. 1998)) (emphasis added).

As mentioned above, Federal Rule of Civil Procedure 9(b) requires a complaint to "state with particularity the circumstances constituting fraud," which means that it must contain specific allegations regarding "the time, place, and content of the alleged misrepresentation." *SNAPP*, 532 F.3d at 504 (citation omitted). Under this rule, "[c]onclusory statements of reliance are not sufficient to explain with particularity how [the plaintiff] detrimentally relied on the alleged fraud . . . ." *Evans v. Pearson Enters.*, 434 F.3d 839, 852-853 (6th Cir. 2006); *see also Glassner v. R. J. Reynolds Tobacco Co.*, 223 F.3d 343, 353 (6th Cir. 2000) (dismissing fraud claim because the plaintiff had "alleged no facts whatsoever that would support a finding that his decedent relied on Defendants' alleged misrepresentations and concealment").

10

Here, the plaintiffs' fraud claims are based entirely on alleged statements contained in, and omissions from, the F300 product data sheet and owner's manual. (*See* Docket No. 1 ¶¶ 123, 131, 140, 145-46, 158.) The plaintiffs allege that the product data sheet misstates the amount of ozone created by the F300 and fails to warn consumers of the dangers of ozone inhalation. (*Id.* ¶¶ 60-62.) The owner's manual likewise fails to "reveal the ill health effects associated with ozone gas." (*Id.* ¶ 131.)

Conspicuously absent from the Complaint, however, are any allegations that the plaintiffs read these documents, either before buying the air cleaners or when deciding to use them. If they did not read the product data sheet or the owner's manual, they could not have relied on the statements contained therein.[5] In fact, the allegations do not indicate that the plaintiffs (1) ever made a conscious decision to have air cleaners installed in their house in the first place, (2) ever made a conscious decision that those air cleaners would be Honeywell F300s, or (3) ever, at any time, read any documentation regarding the F300.[6] Instead, the plaintiffs offer only conclusory allegations that they "relied on Honeywell's false statements." (Docket No. 1 ¶ 162; *see also*

---

[5] The plaintiffs also fail to allege that the contractor who installed the air cleaners read these documents and relayed the information. As a general matter, to support a fraud claim, the relevant misrepresentation must be made directly to the plaintiff. *Jenkins v. Brown*, No. M2005-02022-COA-R3-CV, 2007 Tenn. App. LEXIS 767, at *42 (Tenn. Ct. App. Dec. 14, 2007). But liability may be extended to third persons who did not directly receive the fraudulent communication "when there is evidence that the defendant made the misrepresentation with the intention and understanding that the third parties would rely on the information." *Id.*

[6] The Complaint alleges that Honeywell's responses to Bearden's emails, the first of which she received on November 18, 2008, reiterated the false ozone emission information. (Docket No. 1 ¶¶ 88-94.) But by that time, the plaintiffs had already turned off their air cleaners for the final time. The Complaint also refers to Honeywell's website, (*id.* ¶¶ 63-65), but there is no allegation that the plaintiffs ever visited the site.

11

Docket No. 18 at 11-13 (failing to explain how the plaintiffs relied on the defendant's alleged misrepresentations).)

Accordingly, the plaintiffs have not pleaded reliance with particularity, as required by Rule 9(b). The court will dismiss their claims of fraud, fraudulent concealment, and negligent misrepresentation, as presently alleged, without prejudice.

## IV.    Applicability of New Jersey Law

The plaintiffs have asserted two claims under New Jersey statutes, one under the New Jersey Consumer Fraud Act ("NJCFA"), N.J. Stat. Ann. § 56:8-1 *et seq.*, and one under New Jersey's implied warranties of merchantability and fitness. *See id.* §§ 12A:2-314, 12A:2-315. The defendant argues that New Jersey law does not apply in this action.

When a federal court hears a diversity action or exercises supplemental jurisdiction over state-law claims, the law of the forum state, including choice-of-law rules, applies.[7] *Montgomery v. Wyeth*, 580 F.3d 455, 459 (6th Cir. 2009); *Menuskin v. Williams*, 145 F.3d 755, 761 (6th Cir. 1998). Tennessee employs the "most significant relationship" choice-of-law approach from the Restatement (Second) of Conflict of Laws. *Montgomery*, 580 F.3d at 459. "Under this approach, 'the law of the state where the injury occurred will be applied unless some other state has a more significant relationship to the litigation.'" *Id.* (quoting *Hataway v.*

---

[7] Choice of law is only relevant, of course, if the state laws at issue conflict with each other. *Armstrong v. U.S. Fire Ins. Co.*, 606 F. Supp. 2d 794, 802 (E.D. Tenn. 2009). Although the parties do not actually address this point, conflicts do exist between the relevant New Jersey and Tennessee laws. Most importantly, the NJCFA allows class actions, *Knox v. Samsung Elecs. America, Inc.*, No. 08-4308, 2009 U.S. Dist. LEXIS 53685, at *5 (D.N.J. June 24, 2009), while the analogous Tennessee statute, the Tennessee Consumer Protection Act, does not. *Walker*, 249 S.W.3d at 311.

*McKinley*, 830 S.W.2d 53, 59 (Tenn. 1992)).  This is because, "'generally[,] the law of the state where the injury occurred will have the most significant relationship to the litigation.'"  *Id.* (quoting *Hataway*, 830 S.W.2d at 59).

Contacts a court should consider when assessing a state's relationship to the litigation include: "(a) the place where the injury occurred[;] (b) the place where the conduct causing the injury occurred[;] (c) the domicile, residence, nationality, place of incorporation and place of business of the parties[; and] (d) the place where the relationship, if any, between the parties is centered."  *Hataway*, 830 S.W.2d at 59.  The "default rule" is for "'trial courts [to] apply the law of the place where the injury occurred when each state has an almost equal relationship to the litigation.'"  *Montgomery*, 580 F.3d at 459 (quoting *Hataway*, 830 S.W.2d at 59).

Here, the plaintiffs reside in Tennessee, the air cleaners were installed (and, presumably, purchased) in Tennessee, and the plaintiffs' injuries occurred in Tennessee.  The Complaint alleges that "[a] substantial part of the unlawful conduct giving rise to the claims of Plaintiffs . . . occurred in the Middle District of Tennessee."  (Docket No. 1 ¶ 6.)  There is no allegation that the plaintiffs ever traveled to New Jersey in connection with the air cleaners, that they communicated with anyone from Honeywell before November 2008, or that the air cleaners were manufactured in New Jersey.  Under the factors enunciated in *Hataway*, these facts point to the application of Tennessee law.  Nevertheless, the plaintiffs argue that New Jersey law applies because the defendant is headquartered in that state.

But the location of the defendant's business, standing alone, is not enough to require the application of New Jersey law.  The Tennessee Court of Appeals' decision in *In re*

13

*Bridgestone/Firestone*, 138 S.W.3d 202 (Tenn. Ct. App. 2003), is squarely on point. There, the court applied Mexican law to a product liability suit where the accidents and injuries happened in Mexico, the plaintiffs lived in Mexico, and Mexico was "the center of the relationships between all parties." *Id.* at 208. "Tennessee's only link to the litigation [was the defendant's] maintenance of its principal place of business in Davidson County and the conspiratorial activities that allegedly took place therein." *Id.* New Jersey's relationship to the instant case is no stronger than Tennessee's relationship to the dispute in *Bridgestone*. Thus, New Jersey's "tenuous links to the litigation are simply insufficient to overcome the default rule" that Tennessee, "as the situs of the [injuries] at issue, will provide the applicable law." *Id.*; *see also Montgomery*, 580 F.3d at 460-61 (applying Tennessee law in prescription drug case where, even though the defendant was headquartered in New Jersey, the plaintiff resided in Tennessee and bought and took the drug in Tennessee).

In support of their argument, the plaintiffs rely on *Elias v. Ungar's Food Prods., Inc.*, 252 F.R.D. 233 (D.N.J. 2007). (*See* Docket No. 18 at 16-17.) In *Elias*, the plaintiffs alleged that the defendant violated the NJCFA by understating the fat content of certain foods. The magistrate judge's report and recommendation suggested certification of a nationwide class and found that, under the "most significant relationship" test, New Jersey law applied. 252 F.R.D. at 247. The court based the latter decision on the fact that New Jersey was the defendant's principal place of business, "where it maintains its headquarter offices, plans its product development, advertising, promotion, and marketing strategies, and . . . manufactures and ships its products." *Id.*

14

First, the decision of a New Jersey federal district court applying New Jersey law is not binding on this court. Second, a subsequent District of New Jersey case featuring facts more analogous to the instant case rejected *Elias*' approach. In *Knox v. Samsung Electronics America, Inc.*, No. 08-4308, 2009 U.S. Dist. LEXIS 53685 (D.N.J. June 24, 2009), the court held that Georgia law applied and dismissed the plaintiff's NJCFA claim:

> [T]his Court has been presented with a Georgia plaintiff seeking recovery against a New Jersey corporation on a series of transactions carried out in Georgia. In cases where New Jersey has its own residents' interests at stake, its consumer protection policy has a greater significance than when New Jersey residents are not involved. Although it is true that New Jersey seeks to prevent its corporations from defrauding out-of-state consumers, it is not clear to this Court that New Jersey intended out-of-state consumers to engage in end runs around local law in order to avail themselves of collective and class remedies that those states deny.

*Id.* at *10-11. For the same reasons, New Jersey law does not apply to this case.

The fact that Honeywell is based in New Jersey is not enough to overcome the "default rule" that "the law of the place where the injury occurred [applies] when each state has an almost equal relationship to the litigation." *Hataway*, 830 S.W.2d at 59. Accordingly, the court will dismiss with prejudice the claims that the plaintiffs have brought under New Jersey law.[8]

## V. Magnuson-Moss Claim

The plaintiffs have asserted a class claim under the Magnuson-Moss Warranty Act, 15

---

[8] Alternatively, even if the court were to apply New Jersey law, the breach of warranty claims should be dismissed because it is uncontested that the defendant explicitly disclaimed any implied warranty of merchantability or fitness. (*See* Docket No. 10 at 13; Docket No. 20 at 5.) Under New Jersey law, implied warranties can be disclaimed by conspicuous disclaiming language. N.J. Stat. Ann. § 12A:2-316(2); *see, e.g.*, *Viking Yacht Co. v. Composites One LLC*, 496 F. Supp. 2d 462, 471 (D.N.J. 2007).

15

U.S.C. § 2301 *et seq.* The defendant argues that the plaintiffs have not satisfied the statutory requirements of that act.

The Magnuson-Moss Warranty Act provides a right of action for consumers who are damaged by a manufacturer's breach of warranty. *Id.* § 2310(d). The act requires potential class action plaintiffs to give the defendant notice that they intend to bring suit on behalf of a class:

> No action . . . may be brought under subsection (d) for failure to comply with any obligation under any written or implied warranty . . ., and a class of consumers may not proceed in a class action under such subsection . . ., unless the [defendant] is afforded a reasonable opportunity to cure such failure to comply. In the case of such a class action . . ., such reasonable opportunity will be afforded by the named plaintiffs *and they shall at that time notify the defendant that they are acting on behalf of the class.*

15 U.S.C. § 2310(e).

The language of the statute is mandatory: a class action "may not proceed" unless the pre-suit notice requirement is met, and, in giving such notice, the named plaintiffs "*shall . . . notify the defendant that they are acting on behalf of the class.*"[9] *Id.* (emphasis added). At least one district court has dismissed a Magnuson-Moss claim because the plaintiffs failed to notify the defendant that they were representing a class. *Stearns v. Select Comfort Retail Corp.*, No. 08-2746, 2009 U.S. Dist. LEXIS 112971, at *32-33 (N.D. Cal. Dec. 4, 2009) ("Plaintiffs once again have failed to allege that they provided adequate notice to Select Comfort that they were acting on behalf of the class prior to filing suit.").

---

[9] Contrary to the plaintiffs' suggestion, (Docket No. 18 at 24-25), this is not a jurisdictional requirement, so the Class Action Fairness Act of 2005 is irrelevant. *See* 28 U.S.C. § 1332(d).

16

Here, there is no allegation that, before filing suit, the plaintiffs informed Honeywell that they were acting on behalf of a class. Although Bearden did allegedly indicate in an email to the defendant that she would "begin looking for an attorney," (Docket No. 1 ¶ 93), her message referred only to her own individual claim. Nothing in her correspondence indicated that she planned to bring a class action suit.

Because the plaintiffs have not met the notice requirements of § 2310(e), their Magnuson-Moss claim cannot be maintained on behalf of the putative class.[10]

## VI. Unjust Enrichment Claim and Motion to Strike Class Allegations

The only remaining claim brought on behalf of the putative class is the plaintiffs' unjust enrichment claim.[11] The defendant argues that the plaintiffs may not bring this as a class claim and requests that the court strike the class allegations.[12]

---

[10] As discussed below, the court will strike the plaintiffs' class allegations without prejudice. Thus, if the plaintiffs are able to allege that they did, in fact, give proper notice, they will have an opportunity to cure this defect.

[11] The defendant's Motion to Strike also pertains to the fraud and warranty claims. Because those claims have been dismissed as to the named plaintiffs, they cannot be maintained on behalf of the putative class. *See* Fed. R. Civ. P. 23(a)(3) (requiring that the claims of the representative plaintiffs be typical of the claims of the class); *In re Am. Med. Sys.*, 75 F.3d 1069, 1082 (6th Cir. 1996) (holding that Rule 23(a)(3) requires that the named plaintiffs' claims be "'based on the same legal theory'" as the class claims) (quoting 1 Herbert B. Newberg & Alba Conte, *Newberg on Class Actions*, § 3.13 (3d ed. 1992)).

[12] The defendant also argues that, because unjust enrichment is a quasi-contractual theory and because a contract governed the purchase of the F300s, the plaintiffs cannot state an individual unjust enrichment claim. (Docket No. 10 at 15-16.) This contention is meritless. First, the authorities cited by the defendant do not announce a blanket rule that the existence of a contract precludes an unjust enrichment claim. *See Whitehaven Cmty. Baptist Church v. Holloway*, 973 S.W.2d 592, 596-97 (Tenn. 1998); *B&L Corp. v. Thomas & Thorngren, Inc.*, 162 S.W.3d 189, 217 (Tenn. Ct. App. 2004). Second, the plaintiffs have not alleged that they entered into a contract with Honeywell.

17

The plaintiffs argue that the defendant's Motion to Strike is premature. (Docket No. 18 at 19-20.) Federal Rule of Civil Procedure 12(f) allows a court to "strike from a pleading . . . any redundant, immaterial, impertinent, or scandalous matter." The plaintiffs claim that none of these categories applies here, because the defendant's argument is essentially that the class claims are without merit. But there is precedent for treating a Rule 12(f) motion to strike class allegations as a motion to deny class certification under Rule 23, which governs class actions. *Smith v. Bayer Corp. (In re Baycol Prods. Litig.)*, 593 F.3d 716, 721 n.2 (8th Cir. 2010). Furthermore, Rule 23(d)(1)(D) allows the court to "require that the pleadings be amended to eliminate allegations about representation of absent persons."

Rule 23(c)(1)(A) provides that a court must rule on class certification "[a]t an early practicable time," and "[n]othing in the plain language of [the rule] either vests plaintiffs with the exclusive right to put the class certification issue before the district court or prohibits a defendant from seeking early resolution of the class certification question." *Vinole v. Countrywide Home Loans, Inc.*, 571 F.3d 935, 939-40 (9th Cir. 2009). The Sixth Circuit has stated that a district court should defer decision on class certification issues and allow discovery "if the existing record is inadequate for resolving the relevant issues." *In re Am. Med. Sys.*, 75 F.3d 1069, 1086 (6th Cir. 1996) (citation omitted). But this general rule does not apply if it is clear from the face of the complaint that a proposed class cannot satisfy the requirements of Rule 23.[13]

---

[13] Many courts have reached this conclusion. *E.g.*, *Shein v. Canon U.S.A., Inc.*, No. CV 08-07323, 2009 U.S. Dist. LEXIS 94109, at *23-24 (C.D. Cal. Sept. 22, 2009) (noting that a pre-discovery motion to strike class allegations is appropriate if "any questions of law are clear and

Thus, "[u]nder Rules 23(c)(1)(A) and 23(d)(1)(D), as well as pursuant to Rule 12(f), this Court has authority to strike class allegations prior to discovery if the complaint demonstrates that a class action cannot be maintained."[14] *Hovsepian v. Apple, Inc.*, No. 08-5788, 2009 U.S. Dist. LEXIS 117562, at *5 (N.D. Cal. Dec. 17, 2009). To maintain a class action under Rule 23(b)(3), the plaintiff must show that "questions of law or fact common to class members predominate over any questions affecting only individual members." Fed. R. Civ. P. 23(b)(3). If the complaint shows that individual questions will necessarily predominate, the court can strike the class allegations. *See Thornton v. State Farm Mut. Auto Ins. Co.*, No. 1:06-cv-00018, 2006 U.S. Dist. LEXIS 83972, at *15-16 (N.D. Ohio Nov. 17, 2006) (striking class allegations because claims would require individualized inquiry).

Here, it is clear that adjudication of a class-wide unjust enrichment claim will require

---

undisputed, and . . . under no set of circumstances could the claim succeed"); *Muehlbauer v. GMC*, 431 F. Supp. 2d 847, 870-72 (N.D. Ill. 2006) (noting that, pursuant to Rules 23(c)(1)(A) and 23(d)(1)(D), a court can review class allegations before discovery and strike them if they are "facially deficient and no amount of discovery can save them"); *Clark v. McDonald's Corp.*, 213 F.R.D. 198, 205 n.3 (D.N.J. 2003) ("A defendant may move to strike class action allegations prior to discovery in those rare cases where the complaint itself demonstrates that the requirements for maintaining a class action cannot be met."); *see also John v. Nat'l Sec. Fire & Cas. Co.*, 501 F.3d 443, 445 (5th Cir. 2007) ("Where it is facially apparent from the pleadings that there is no ascertainable class, a district court may dismiss the class allegation on the pleadings."); *Lumpkin v. E.I. Du Pont De Nemours & Co.*, 161 F.R.D. 480, 481-82 (M.D. Ga. 1995) (denying certification early in discovery because individual issues predominated and noting that "'[s]ometimes the issues are plain enough from the pleadings to determine whether the interests of the absent parties are fairly encompassed within the named plaintiff's claim . . .'") (quoting *Gen. Tel. Co. of the Sw. v. Falcon*, 457 U.S. 147, 160 (1982)).

[14] This is so, even though "Rule 12(f) motions to strike are generally regarded with disfavor." *In re Wal-Mart Stores, Inc.*, 505 F. Supp. 2d 609, 614-16 (N.D. Cal. 2007) (exercising discretion and declining to rule on "suspicious" class definitions before the beginning of class discovery).

19

individualized inquiry regarding each class member.  Under Tennessee law, the elements of unjust enrichment are: "1) [a] benefit conferred upon the defendant by the plaintiff; 2) appreciation by the defendant of such benefit; and 3) acceptance of such benefit under such circumstances that it would be inequitable for him to retain the benefit without payment of the value thereof."[15]  *Freeman Indus. LLC v. Eastman Chem. Co.*, 172 S.W.3d 512, 525 (Tenn. 2005) (quotation marks and citation omitted) (alteration in original).  "The most significant requirement of an unjust enrichment claim is that the benefit to the defendant be unjust."  *Id.*

The benefit conferred on Honeywell, in the case of both the named plaintiffs and the putative class members, is the profit the company realized from the sale of F300s.  The "inequitable" element of the named plaintiffs' individual claim, however, is atypical of the class.  For Bearden, the alleged injustice is that she suffered severe health problems because the defendant failed to disclose the F300's true ozone output.  But the putative class expressly excludes "anyone other than Plaintiffs seeking to recover for physical injuries caused by F300's [sic]," (Docket No. 1 ¶ 95), and the Complaint does not allege that the ozone levels created by the F300 cause any problems other than physical injuries.

This means that the class consists solely of people who bought the F300 and used it with no ill effects.  It is conceivable that such a plaintiff could still meet the "inequitable" requirement; for example, some class members might be able to prove that, had they known of

---

[15] The court does not need to address whether Tennessee law would govern an unjust enrichment claim for a nation-wide class.  It is enough to note that many states use the same formulation of the "inequitable" element as Tennessee.  *See* 66 Am. Jur. 2d *Restitution and Implied Contracts* § 12 n.3 (collecting cases from ten such jurisdictions).

the F300's true ozone output, they would not have purchased the air cleaner. But there are undoubtedly many other class members who are satisfied with their F300s, or who are at least not bothered by its ozone output. Allowing the defendant to retain its profits from sales to those class members is not inequitable; for their money, the consumers received a product that met their expectations and performed adequately. It is clear, then, that resolution of the unjust enrichment claim will depend on the specific facts of each class member's transaction. *Cf. Hovsepian*, 2009 U.S. Dist. LEXIS 117562 at *18 (striking class allegations because "the class is not ascertainable because it includes members who have not experienced any problems with their [product]. Such members have no injury and no standing to sue.").

Indeed, for this reason, class-wide adjudication is generally not appropriate for unjust enrichment claims. As the Eleventh Circuit recently stated:

> Critical for present purposes, before it can grant relief on this equitable claim, a court must examine the particular circumstances of an individual case and assure itself that, without a remedy, inequity would result or persist. Due to the necessity of this inquiry into the individualized equities attendant to each class member, courts, including ours, have found unjust enrichment claims inappropriate for class action treatment. In short, common questions will rarely, if ever, predominate an unjust enrichment claim, the resolution of which turns on individualized facts.

*Vega v. T-Mobile USA, Inc.*, 564 F.3d 1256, 1274 (11th Cir. 2009) (applying Florida law, which requires the same elements for an unjust enrichment claim as Tennessee law).

Because it is apparent from the face of the Complaint that individual issues will predominate the resolution of the unjust enrichment claim, the court will strike the plaintiffs'

21

class allegations.[16]  The allegations will be stricken without prejudice, however, in case the plaintiffs can cure the defects in their other class claims.

## CONCLUSION

For all of the reasons discussed above, the defendant's Motion to Dismiss and Motion to Strike will be granted in part and denied in part.  The court will dismiss the plaintiffs' fraudulent concealment, fraud, and negligent misrepresentation claims without prejudice, and it will dismiss the New Jersey Consumer Fraud Act and New Jersey implied warranty claims with prejudice.  In addition, the court will strike the plaintiffs' class allegations without prejudice.

An appropriate order will enter.

_____
ALETA A. TRAUGER
United States District Judge

---

[16] At this time, it is not necessary for the court to reach the defendant's other arguments regarding Rule 23's requirements.  (*See* Docket No. 10 at 17-21; Docket No. 20 at 7-8.)

22