# IN THE UNITED STATES DISTRICT COURT FOR THE
## MIDDLE DISTRICT OF TENNESSEE
## NASHVILLE DIVISION

| | | |
|---|---|---|
| **JAMES BEARDEN AND SHEILA BEARDEN,** **individually and on behalf of all others similarly situated,** | ) ) ) ) | |
| **Plaintiffs,** | ) ) | |
| **v.** | ) ) | **Case No. 3:09-1035** **Judge Trauger** |
| **HONEYWELL INTERNATIONAL INC.,** | ) ) | |
| **Defendant.** | ) | |

## MEMORANDUM

Pending before the court is the defendant's Motion to Strike Class Allegations and to Dismiss (Docket No. 41), to which the plaintiffs have filed a response (Docket No. 52) and in support of which the defendant has filed a reply (Docket No. 56). For the reasons discussed below, the defendant's motion will be granted in part and denied in part.

## BACKGROUND

This is the defendant's third combined Motion to Strike and Motion to Dismiss. Twice before, the court has dismissed certain claims and struck certain class action allegations; both times, the plaintiffs subsequently amended their complaint. The operative pleading is now the Second Amended Complaint (Docket No. 39).

The court will once again recite the main allegations. On May 8, 2008, plaintiffs James

1

and Sheila Bearden moved into a newly constructed home in Nashville, Tennessee.[1]  Two model

F300 electronic air cleaners, manufactured by defendant Honeywell International Inc.

("Honeywell"), were installed in the house's heating system.

The plaintiffs allege that they relied on the recommendation of Daryl Bennett of Lebanon

Heating and Air when deciding which air cleaner to install.  (Docket No. 39 ¶ 9.)  Bennett

allegedly "based his decision to provide Honeywell F300's to the Beardens on Honeywell's

written materials, including the manual" (*id.* ¶ 11), and he advised the plaintiffs that they should

run the air cleaners constantly for a month or so after moving in (*id.* ¶ 13).  Although Bennett

"discussed the benefits of the F300," he did not "address the ozone generated by the F300's."

(*Id.* ¶ 61.)

The plaintiffs allege that, within days of moving in, Sheila Bearden ("Bearden")

developed a respiratory illness.  Over the next several months, she suffered sore throats,

coughing, fatigue, and other troubling symptoms.  By November 2008, Bearden had allegedly

developed a hypersensitivity to smells and everyday chemicals.  The plaintiffs allege that, in six

months, Bearden went from being a healthy and active person to being "filled with pain, fear and

anxiety."  (*Id.* ¶ 46.)

Eventually, Bearden read that electronic air cleaners can contribute to poor indoor air

quality, and the plaintiffs permanently turned off their air cleaners.  Bearden's health problems

continued, however, and she and her husband were forced to move out of their house for several

---

[1] Unless otherwise noted, the allegations are drawn from the plaintiffs' Second Amended
Class Action Complaint (Docket No. 39).

months.  The plaintiffs allege that Bearden's symptoms have "lessened to some degree since she turned off her air cleaners," although she continues to suffer from hypersensitivity to many everyday chemicals.  (*Id.* ¶¶ 58-59).

According to the plaintiffs, Bearden's health problems were caused by ozone.  Ozone is a molecule consisting of three oxygen atoms and is emitted by certain types of electronic air cleaners, including the F300.  The plaintiffs allege, citing EPA documents and various articles, that ozone exposure can cause breathing difficulties, lung damage, and chemical hypersensitivity.  (*See id.* ¶¶ 77-86.)

The product data sheet that Honeywell distributed with the F300 claimed that the air cleaner "contributes .005 to .010 ppm [parts per million] of ozone to the indoor air."  (*Id.* ¶ 64.) This equals 5 to 10 parts per billion (ppb).  The document also notes that "[t]he U.S. Food and Drug Administration and Health and Welfare Canada recommend that indoor ozone concentration should not exceed .050 ppm," or 50 ppb.  (*Id.*)  The plaintiffs allege that the defendant has understated the amount of ozone produced by the F300.  They cite a study published by the magazine *Consumer Reports* that found that the F300 actually generates ozone levels of between 25 and 50 ppb.  The plaintiffs allege that the defendant's failure to accurately label the F300's ozone output and to warn of ozone's deleterious effects led to Bearden's health problems.

The plaintiffs now assert claims for: (1) strict liability for failure to warn; (2) negligent failure to warn; (3) violation of the Magnuson-Moss Warranty Act; (4) unjust enrichment; (5) breach of express warranty; (6) fraudulent concealment; (7) fraud; (8) negligent

3

misrepresentation; and (9) violation of the Tennessee Consumer Protection Act. They have asserted Claims 5 through 9 on behalf of a putative class. The class is defined as "all customers in the United States who have purchased Honeywell F300 Series Electronic Air Cleaners," but it expressly excludes "anyone other than Plaintiffs seeking to recover for physical injuries caused by F300's." (*Id.* ¶ 100.) The plaintiffs seek "the recovery of consideration that . . . members of the Class paid to purchase the F300's." (*Id.* ¶ 104.)

## ANALYSIS

The defendant has filed a Motion to Strike Class Allegations and to Dismiss, pursuant to Federal Rules of Civil Procedure 12(b)(6) and 12(f).

### I. Motion to Dismiss Standard

The Federal Rules of Civil Procedure require plaintiffs to provide "a short and plain statement of the claim showing that the pleader is entitled to relief." Fed R. Civ. P. 8(a)(2). In deciding a motion to dismiss under Rule 12(b)(6), the court will "construe the complaint in the light most favorable to the plaintiff, accept its allegations as true, and draw all reasonable inferences in favor of the plaintiff." *Directv, Inc. v. Treesh*, 487 F.3d 471, 476 (6th Cir. 2007); *Inge v. Rock Fin. Corp.*, 281 F.3d 613, 619 (6th Cir. 2002). The court must assume that all of the factual allegations are true, even if they are doubtful in fact. *Bell Atlantic Corp. v. Twombly*, 550 U.S. 544, 555 (2007). In contrast, legal conclusions are not entitled to the assumption of truth. *Ashcroft v. Iqbal*, __ U.S. __, 129 S. Ct. 1937, 1950 (2009).

Generally, a complaint does not need to contain "detailed factual allegations," although its allegations "must be enough to raise a right to relief above the speculative level." *Twombly*,

4

550 U.S. at 555. "Blanket assertions" or a "formulaic recitation of the elements of a cause of action" are not sufficient. *Twombly*, 550 U.S. at 555, 556 n.3. In other words, "a complaint must contain sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'" *Iqbal*, 129 S. Ct. at 1949 (quoting *Twombly*, 550 U.S. at 570).

A higher pleading standard applies to claims of fraud. When alleging fraud, "a party must state with particularity the circumstances constituting fraud." Fed. R. Civ. P. 9(b). This requires allegations about "the time, place, and content of the alleged misrepresentation . . . ; the fraudulent intent of the defendants; and the injury resulting from the fraud." *United States ex rel. SNAPP, Inc. v. Ford Motor Co.*, 532 F.3d 496, 504 (6th Cir. 2008) (citation omitted). Rule 9(b), however, "should be interpreted in harmony with Rule 8's statement that a complaint must only provide 'a short and plain statement of the claim' made by 'simple, concise, and direct allegations.'" *Id.* at 503. The key consideration is whether the complaint gives the defendant fair notice of the fraud claim and enables the defendant to prepare a responsive pleading. *Id.* at 504.

## II. Fraud Claims

Honeywell argues that both the individual fraud claims and the class-action fraud claims have fatal defects.

### A. Individual Claims

The defendant argues that the Beardens have failed to properly allege reliance, which is an element of their fraud, negligent misrepresentation, and fraudulent concealment claims. (Docket No. 42 at 16-17.) The defendant did not make this argument in its most recent Motion to Dismiss, and the court noted in its Memorandum that the allegations in the First Amended

5

Complaint were, in fact, sufficient to plead reliance.  (Docket No. 37 at 10 n.4.)

Nevertheless, the court will address the defendant's argument.  The Second Amended Complaint alleges that Bennett, the contractor who recommended the F300, had "read the manual and other material provided by Honeywell with F300's," which contained the allegedly fraudulent statements and omissions.  (Docket No. 39 ¶ 10.)  The Beardens allegedly "discussed their concerns and the desire to maintain clean air in their home with [the contractor]" and questioned him "about the importance of limiting pollutants in the indoor air in light of Ms. Bearden's seasonal allergies and her mother'[s] Chronic Obstructive Pulmonary Disease (COPD)."  (*Id.* ¶ 9.)  The contractor allegedly "told the Beardens about Honeywell's quality and reputation in the industry" (*id.* ¶ 10) and "discussed the benefits of the F300" with them (*id.* ¶ 61).  In selecting the air cleaner, the Beardens "[r]el[ied] upon" the contractor's "recommendation and his expertise in the HVAC field."  (*Id.* ¶ 10.)  The complaint alleges that the contractor "based his decision to provide Honeywell F300's to the Beardens on Honeywell's written materials, including the manual, and would not have selected the F300 for the Beardens had he received accurate materials setting out the true ozone levels produced by F300's and health issues associated with those levels."  (*Id.* ¶ 11.)

In certain circumstances, a plaintiff may recover for fraud even if the defendant's allegedly fraudulent statement was not made directly to him or her.  Honeywell argues that the plaintiffs have not sufficiently alleged that the contractor repeated any statement from Honeywell.  (Docket No. 42 at 17 (citing *Nernberg v. Pearce*, 35 F.3d 247, 251 (6th Cir. 1994) (applying Michigan law and noting that the defendant must intend that "the misrepresentation

6

would be repeated to induce reliance" by the third party).)  But Tennessee law merely requires

that "there is evidence that the defendant made the misrepresentation with the intention and

understanding that the third parties would rely on the information."  *Jenkins v. Brown*, No.

M2005-02022-COA-R3-CV, 2007 Tenn. App. LEXIS 767, at *42 (Tenn. Ct. App. Dec. 14,

2007); *see also Arcata Graphics Co. v. Heidelberg Harris*, 874 S.W.2d 15, 23 (Tenn. Ct. App.

1993) (holding that third persons may recover for fraud "'where such third persons are intended

to rely and act upon false representations and they do so rely and act thereon'" (quoting 37 Am.

Jur. 2d *Fraud and Deceit* § 298 (1968)); Restatement (Second) of Torts § 533 (1977) (permitting

liability to a third party if the defendant "expect[s] that its terms will be repeated *or its substance

communicated* to the [third party]" (emphasis added)).  There is no requirement that the

fraudulent statement be repeated verbatim.[2]

Here, the alleged fraud relates to the ozone emitted by the F300.  The product manual

stated that the air cleaner creates ozone levels of 5-10 ppb, which is far lower than the 50 ppb

limit recommended by the FDA.  The substance of this statement is that the F300 does not create

unsafe ozone levels, or, more broadly, that the F300 cleans the air without adding potentially

harmful pollutants.  The plaintiffs allege: (1) that the contractor read this statement; (2) that,

based on this statement, he discussed the effectiveness of the F300 with the Beardens and

recommended the product in response to their concerns about air quality; and (3) that the

Beardens relied on the contractor's statements.  This is enough to allege that the contractor

---

[2] The other case cited by the defendant, *Sebago, Inc. v. Beazer East, Inc.*, 18 F. Supp. 2d
70 (D. Mass. 1998), is not to the contrary.  That case recognized that liability may exist when the
"substance" of the misrepresentation is communicated to the plaintiff.  *Id.* at 86.

communicated the substance of Honeywell's allegedly fraudulent statement and omissions and that the Beardens relied thereon. Accordingly, the court will not dismiss the individual fraud claims.

**B.      Class Claims**

Next, the defendant argues that, because the elements of fraud vary among the 50 states, a nationwide fraud class would be unmanageable. (Docket No. 42 at 3-8.) It further argues that the economic loss doctrine bars the fraud claims of any absent class members in Tennessee. (Docket No. 42 at 8-9.)

A district court should defer decision on class certification issues and allow discovery "if the existing record is inadequate for resolving the relevant issues." *In re Am. Med. Sys.*, 75 F.3d 1069, 1086 (6th Cir. 1996) (quotation marks omitted). In its most recent Motion to Strike, the defendant made several arguments regarding class certification of the fraud claims, including that the proposed class was not manageable. In its Memorandum, the court stated that discovery and further briefing were necessary to resolve the issues raised by the defendant. (Docket No. at 16-23.)

The defendant has offered more detailed briefing of the manageability issue, but, for the reasons expressed in the previous Memorandum, the court still believes that development of the factual record will assist it in deciding whether a class should be certified. The defendant points out a number of areas in which the laws of the various states diverge regarding fraud: some states require that the defendant knew that the relevant misrepresentation was false, while others do not; some require that the misrepresentation be material, while others do not; and different

8

states apply different burdens of proof to fraudulent concealment claims. But these differences only affect class certification if they create a material conflict, and whether the conflicts are material depends on the factual contours of the fraud claims.

In addition, it is possible that some of the conflicts can be adequately addressed by certifying subclasses. This topic, however, is more properly addressed on a Motion to Certify, rather than a Motion to Strike. The court will also wait to address the defendant's arguments regarding the economic loss doctrine; if that doctrine does apply to bar claims by absent class members in Tennessee or any other state, it will bear on the appropriate subclass definitions.

Although the defendant's arguments may ultimately prove to be meritorious, they are premature, so the court will not strike the class allegations relating to the plaintiffs' fraud claims.

## III.    Express Warranty and Magnuson-Moss Warranty Act Claims

The Second Amended Complaint asserts a claim under the Magnuson-Moss Warranty Act ("MMWA" or the "Act"), 15 U.S.C. 2301 *et seq.* Previously, the plaintiffs based their MMWA claim on the alleged breach of an implied warranty. After the most recent Motion to Dismiss, the court granted leave to the plaintiffs to assert a state-law implied warranty claim, noting that their MMWA claim could not survive without a viable underlying state-law claim. (Docket No. 37 at 10.)

In their Second Amended Complaint, the plaintiffs have added an express warranty claim, and they now base their MMWA claim on an express, written warranty. This express warranty, which is contained in the F300 product manual, states that Honeywell "warrants this product to be free from defects in the workmanship or materials" and that Honeywell will repair

9

or replace the product if it is "defective or malfunctions." (Docket No. 39, Ex. 1 at 16.)

### A.    Express Warranty Claim

The defendant argues that the plaintiffs cannot maintain their state-law warranty claim because they did not rely on the warranty when deciding to purchase the air cleaners. (Docket No. 42 at 15-16.)

Tennessee has adopted the U.C.C., which provides that an express warranty is created when the seller makes a representation or promise to the buyer that becomes "part of the basis of the bargain." Tenn. Code Ann. § 47-2-313(1)(a)-(c). This means that the plaintiff must have been aware of the warranty and must have relied on it when deciding to purchase the product. *See Coffey v. Dowley Mfg.*, 187 F. Supp. 2d 958, 973 (M.D. Tenn. 2002) (dismissing express warranty claim because "it [was] not clear that [the plaintiff] ever read or specifically relied on these affirmations"); *Smith v. Bearfield*, 950 S.W.2d 40, 41 (Tenn. Ct. App. 1997) (holding that an express warranty existed because "the purchaser relied upon [the seller's] representations, making them a part of the basis for the sale"); *In re Bisphenol-A (BPA) Polycarbonate Plastic Prods. Liab. Litig.*, 687 F. Supp. 2d 897, 906 (W.D. Mo. 2009) (collecting cases from various jurisdictions analyzing the relevant U.C.C. provision and stating that, "[i]f one party (here, the buyer) is not aware of the statement, that party cannot claim the statement became a part of the parties' bargain").

Here, the plaintiffs did not read the product manual before purchasing the air cleaners, so they could not have directly relied on the express warranty. Nor did they indirectly rely on it through their conversation with the contractor. As explained above, the Beardens indirectly

relied on Honeywell's allegedly fraudulent statements and omissions regarding ozone because, when talking to the contractor, they discussed the F300's ability to safely clean the air. But the complaint does not allege that the contractor mentioned the express warranty or Honeywell's willingness to replace defective parts. Nothing indicates that the plaintiffs knew of the warranty, much less that they relied on it.

Because the express warranty was not part of the basis of the parties' bargain, the individual warranty claim must be dismissed. Consequently, the plaintiffs may not maintain an express warranty claim on behalf of the class. *See* Fed. R. Civ. P. 23(a)(3) (requiring that the claims of the representative plaintiff be typical of the claims of the class).

**B.      MMWA Claim**

Honeywell argues that the MMWA claim must also be dismissed. (Docket No. 42 at 19.) In its previous Memorandum, the court stated that "[t]he Act does not provide an independent cause of action for state law claims, only additional damages for breaches of warranty under state law." (Docket No. 37 at 9 (quoting *Fedrick v. Mercedes-Benz USA, LLC*, 366 F. Supp. 2d 1190, 1200 n.14 (N.D. Ga. 2005).) But it does not necessarily follow that, because the state-law express warranty claim has been dismissed, the plaintiffs' current MMWA is not viable.

Section 2310 of the Act permits "a consumer who is damaged by the failure of a . . . warrantor . . . to comply with . . . a written warranty [or] implied warranty" to bring a suit for damages. 15 U.S.C. § 2310(d)(1). The plaintiffs previously based their MMWA claim on an implied warranty. Because the Act defines "implied warranty" as "an implied warranty arising under State law," *id.* § 2301(7), the claim depended on the existence of a valid underlying state-

law implied warranty claim.

But the current version of the plaintiffs' MMWA claim is based on the *written* warranty contained in the product manual. The Act contains two alternative definitions for "written warranty":

> (A) any written affirmation of fact or written promise made in connection with the sale of a consumer product by a supplier to a buyer which relates to the nature of the material or workmanship and affirms or promises that such material or workmanship is defect free or will meet a specified level of performance over a specified period of time, or
>
> (B) any undertaking in writing in connection with the sale by a supplier of a consumer product to refund, repair, replace, or take other remedial action with respect to such product in the event that such product fails to meet the specifications set forth in the undertaking, which written affirmation, promise, or undertaking becomes part of the basis of the bargain between a supplier and a buyer for purposes other than resale of such product.

*Id.* § 2301(6). The first definition, which encompasses the warranty in the F300 product manual, does not require that the warranty be "part of the basis of the bargain" between the seller and the buyer. Because it does not require that the buyer relied on the warranty when deciding to purchase the product, it is broader than the definition of "express warranty" under Tennessee law. *See* Tenn. Code Ann. § 47-2-313(1). Thus, the plaintiffs' current MMWA claim does not fail simply because their Tennessee express warranty claim fails.

Honeywell makes two further arguments regarding the MMWA claim. First, it states that the plaintiffs have not properly alleged a breach of the written warranty, because the warranty states that the air cleaner would be "free from defects in workmanship or materials," and the plaintiffs have alleged that the design of the air cleaners, not the workmanship, was defective.

12

(Docket No. 42 at 15.)  But the central allegation in this case is that the F300 produces an excessive amount of ozone.  The complaint does not foreclose the possibility that this overproduction is caused by some sort of persistent manufacturing defect.  Although it is true that much of the complaint is premised on the allegation that the F300 is defectively designed, a plaintiff is allowed to plead claims in the alternative.  *See* Fed. R. Civ. P. 8(d)(2); *see also Alin v. Am. Honda Motor Co.*, No. 08-4825, 2010 U.S. Dist. LEXIS 32584, at *17 (D.N.J. Mar. 31, 2010) ("At the pleading stage, where the distinction between defect in design and defect in materials or workmanship is a matter of semantics, and sufficient facts are alleged to assert both, the defendant's characterization of the nature of the claim pre-discovery should not control whether the complaint survives.").  The exact nature of the alleged defects will become clearer after discovery.

Second, the defendant argues that the claim does not meet the $50,000 statutory threshold for MMWA claims filed in federal court.[3]  (Docket No. 42 at 18-19.)  Section 2310 of the Act provides that a plaintiff may file a claim "in any court of competent jurisdiction in any State or the District of Columbia," *id.* § 2310(d)(1)(A), or in a federal district court, *id.* § 2310(d)(1)(B).  In the latter case – but only in the latter case – the Act provides that "[n]o claim shall be cognizable . . . if the amount in controversy is less than the sum or value of $50,000 . . . computed on the basis of all claims to be determined in this suit."  *Id.* § 2310(d)(3)(B).

The defendant argues that the $50,000 threshold is a "claim-processing rule," as opposed

---

[3] The defendant states that the purchase price of the F300 is approximately $600, and it argues that personal injury damages are not recoverable for the alleged breach of warranty. (Docket No. 42 at 18 n.18, 19 (citing 15 U.S.C. § 2311(b)(2)).)

13

to a jurisdictional limitation. (Docket No. 42 at 18 (citing *Reed Elsevier, Inc. v. Muchnick*, __ U.S. __, 130 S. Ct. 1237, 1243-44 (2010).) This distinction matters because if the requirement is a claim-processing rule, it becomes a substantive element of the claim for relief, and the plaintiffs' claim, if under $50,000, would fail on the merits. In contrast, if the requirement is merely jurisdictional, the court would lack jurisdiction to hear the claim, but the claim would not be substantively defective.

Jurisdictional rules restrict a court's adjudicatory authority, while claim-processing rules provide substantive restrictions on a claim for relief. *Reed Elsevier*, 130 S. Ct. at 1243-44; *Arbaugh v. Y & H Corp.*, 546 U.S. 500, 511, 514-16 (2006). More specifically, "the term 'jurisdictional' properly applies only to prescriptions delineating the classes of cases (subject-matter jurisdiction) and the persons (personal jurisdiction) implicating [adjudicatory] authority." *Reed Elsevier*, 130 S. Ct. at 1243 (quotation marks omitted). Thus, "'[j]urisdictional statutes speak to the power of the court rather than to the rights or obligations of the parties.'" *Id.* (quoting *Landgraf v. USI Film Prods.*, 511 U.S. 244, 274 (1994)) (quotation marks omitted). In determining the nature of a requirement, the court should "focus on the 'legal character' of the requirement," which it "discern[s] by looking to the condition's text [and] context." *Id.* at 1246.

Given the structure of the Act, the $50,000 requirement is clearly a jurisdictional limitation, not a substantive element of the claim for relief. This is because the $50,000 threshold applies only to actions brought in federal district court. A consumer may, under the plain terms of the Act, bring a claim for less than that amount in state court. *See* 15 U.S.C. §§ 2310(d)(1)(A), 2310(d)(3)(B); *Torres-Fuentes v. Motorambar, Inc.*, 396 F.3d 474, 476 (1st Cir.

14

2005) (holding that a "plaintiff should not be barred from raising the identical claims in state court under the [MMWA] after a dismissal for failure to satisfy the $50,000 jurisdictional hurdle"). Accordingly, the requirement merely restricts a federal district court's adjudicatory authority; it does not substantively limit the Beardens' right to recover.[4] *Cf. Arbaugh*, 546 U.S. at 515 (holding that a threshold requirement was not jurisdictional because it did not "refer in any way to the jurisdiction of the district courts"). Indeed, the Sixth Circuit recently stated that the $50,000 threshold is a jurisdictional requirement. *Schultz v. Gen. R.V. Ctr.*, 512 F.3d 754, 757 (6th Cir. 2008) ("[Under the MMWA,] merely alleging a violation of the act is insufficient to confer *federal question jurisdiction*; a separate $50,000 amount in controversy requirement must also be satisfied." (emphasis added)). Thus, the Beardens' MMWA claim can be substantively viable even if the damages do not exceed $50,000.

The parties dispute whether damages sought pursuant to the Beardens' other claims should count toward the $50,000 jurisdictional threshold, but this is a moot point. The court may exercise supplemental jurisdiction over claims when it otherwise lacks subject-matter jurisdiction. *See* 28 U.S.C. § 1367(a). The MMWA claim is clearly "part of the same case or controversy" as the remaining claims, *see id.*, so supplemental jurisdiction would be proper here. If the court lacked subject-matter jurisdiction over the claim, it would simply exercise its supplemental jurisdiction. *See Ferroni v. General Motors Corp.*, 694 F. Supp. 1193 (E.D. Pa.

---

[4] The defendant erroneously argues that the court has previously ruled that § 2310 does not contain jurisdictional requirements. (Docket No. 56 at 5.) In fact, the court ruled that the requirements of § 2310(e) were not jurisdictional. (Docket No. 24 at 16 n.9.) That ruling did not address any other subsection of § 2310.

1987) (exercising pendant jurisdiction over a MMWA claim that failed to meet the $50,000 threshold).

Accordingly, the court will not dismiss the plaintiffs' individual MMWA claim.

## IV. Tennessee Consumer Protection Act Claim

Finally, the defendant argues that the Beardens may not maintain a class-action claim under the Tennessee Consumer Protection Act ("TCPA"), Tenn. Code Ann. § 47-18-104 *et seq.*

Tennessee law is clear that a plaintiff may not bring a TCPA claim on behalf of a class. *Walker v. Sunrise Pontiac-GMC Truck, Inc.*, 249 S.W.3d 301, 308-11 (Tenn. 2008). The TCPA provides that "[a]ny person who suffers an ascertainable loss . . ., as a result of . . . an unfair or deceptive act or practice declared to be unlawful by this part, may bring an action individually to recover actual damages." Tenn. Code Ann. § 47-18-109(a)(1). In *Walker*, the Tennessee Supreme Court held that the phrase "may bring an action individually" is unambiguous and that the statute does not authorize a plaintiff to bring a class-action TCPA claim. 249 S.W.3d at 309-11. The court pointed out that "the TCPA uses the singular terms 'individual' and 'person' throughout." *Id.* at 309. It also stated that this interpretation comported with public policy, because, as to "the protection of classes of consumers, the Attorney General and the Division of Consumer Affairs of the Tennessee Department of Commerce and Insurance can investigate and prosecute violations of the TCPA." *Id.* at 311. "[T]hese provisions demonstrate that the [Tennessee] legislature provided several clearly articulated avenues by which the TCPA can fully protect and benefit consumers." *Id.*

The plaintiffs argue that, regardless of state law, the recently decided U.S. Supreme

16

Court case of *Shady Grove Orthopedic Associates, P.A. v. Allstate Insurance Co.*, __ U.S. __, 130 S. Ct. 1431 (2010), compels this court to allow the class-action TCPA claim to go forward. That case dealt with a New York procedural statute, N.Y. C.P.L.R. § 901, that was largely analogous to Federal Rule of Civil Procedure 23, except that it prohibited class actions in suits seeking penalties or statutory minimum damages. *Id.* at 1436. The *Shady Grove* plaintiff filed a putative class action in the Eastern District of New York, seeking to recover unpaid statutory interest under New York law from the defendant insurance company. *Id.* at 1437. The district court and the Second Circuit held that the New York rule applied to bar class treatment of the claim. *Id.*

The Supreme Court reversed. In an opinion authored by Justice Scalia, a majority of the Court noted that Federal Rule of Civil Procedure 23 "creates a categorical rule entitling a plaintiff whose suit meets the specified criteria to pursue his claim as a class action," *id.* at 1438, and that the New York statute "flatly contradict[ed]" Rule 23,[5] *id.* at 1441. The Court held that a conflicting state class-action provision can apply in a diversity suit only if "Rule 23 is ultra vires," or outside the authorization of the Rule Enabling Act, 28 U.S.C. § 2071 *et seq.*[6] *Id.* at 1437, 1441.

In discussing how to apply this holding to the case at hand, however, the majority

---

[5] The four dissenting Justices indicated that deference to state law was appropriate. *See Shady Grove*, 130 S. Ct. at 1462-65 (Ginsburg, J., dissenting). They concluded that there was no "unavoidable conflict" between the New York and federal laws, *id.* at 1465-69, and that the state rule should be enforced because disregarding it would encourage forum shopping, *id.* at 1469-72.

[6] The majority noted that it was not deciding "whether a state law that limits the remedies available in an existing class action would conflict with Rule 23." *Shady Grove*, 130 S. Ct. at 1439.

fractured.  Effectively, there was a 4-1-4 split in the opinions.  Justice Scalia, writing for himself and three other Justices, found that Rule 23 is within the authorization of the Rules Enabling Act because it "really regulat[es] procedure" – that is, "it governs only the manner and the means by which the litigants' rights are enforced."  *Id.* at 1442 (quotation marks omitted).  In other words, the rule does not "alter[] the rules of decision by which [the] court will adjudicate [those] rights."  *Id.* (quotation marks omitted) (second and third alterations in original).  Accordingly, Justice Scalia concluded that Rule 23 applied to allow the class action in spite of the New York statute and that "the substantive nature of New York's law, or its substantive purpose, *makes no difference*."[7]  *Id.* at 1444.

Justice Stevens, who declined to join that section of Justice Scalia's opinion, wrote a separate, narrower concurrence in the judgment.  Justice Stevens noted that the Rules Enabling Act provides that the federal procedural rules "'shall not abridge, enlarge, or modify any substantive right.'"  *Id.* at 1449 (Stevens, J., concurring in part and concurring in the judgment) (quoting 28 U.S.C. § 2072(b)).  This means that "federal rules cannot displace a State's definition of its own rights or remedies."  *Id.*  Under Justice Stevens's approach, whether a state law displaces a federal rule "turns on whether the state law actually is part of a State's framework of substantive rights or remedies," *id.* at 1449, which requires a court to carefully interpret the state and federal provisions at issue, *id.* at 1450.  He concluded that a state procedural rule "may in some instances become so bound up with the state-created right or

---

[7] Justice Scalia further concluded that forum shopping was not a relevant concern: "Congress itself has created the possibility that the same case may follow a different course if filed in federal instead of state court."  *Shady Grove*, 130 S. Ct. at 1448.

remedy that it defines the scope of that substantive right or remedy." *Id.* "Such laws, for example, may be seemingly procedural rules that make it significantly more difficult to bring or to prove a claim, thus serving to limit the scope of that claim." *Id.* Thus, Justice Stevens held that, under the Rules Enabling Act, "[a] federal rule . . . cannot govern a particular case in which the rule would displace a state law that is procedural in the ordinary use of the term but is so intertwined with a state right or remedy that it functions to define the scope of the state-created right." *Id.* at 1452; *see also id.* at 1456.

Justice Stevens found, however, that the New York statute at issue was not such a law, so Rule 23 properly applied. *Id.* at 1457-60. This was because the state statute was designed as a procedural rule, which "suggests that it reflects a judgment about how state courts ought to operate and not a judgment about the scope of state-created rights and remedies." *Id.* at 1457. The rule applied not only to claims based on New York law, but also to claims based on federal law or the law of other states. *Id.* This made it "hard to see how § 901(b) could be understood as a rule that . . . serves the function of defining New York's rights or remedies." *Id.* Furthermore, "[t]he legislative history . . . reveals a classically procedural calibration of making it easier to litigate claims in New York courts (under any source of law) only when it is necessary to do so, and not making it too easy when the class tool is not required." *Id.* at 1459. This did not "transform" the procedural rule "into a damages 'proscription' or 'limitation.'" *Id.* (citations omitted).

Under the rule announced in *Marks v. United States*, 430 U.S. 188 (1977), "'[w]hen a fragmented Court decides a case and no single rationale explaining the result enjoys the assent of

five Justices, the holding of the Court may be viewed as that position taken by those Members who concurred in the judgments on the narrowest grounds.'" *United States v. Cundiff*, 555 F.3d 200, 208 (6th Cir. 2009) (quoting *Marks*, 430 U.S. at 193) (alteration in original). Here, that means that Justice Stevens's concurrence is the controlling opinion. *See In re Whirlpool Corp. Front-Loading Washer Prods. Liab. Litig.*, No. 1:08-WP-65000, 2010 U.S. Dist. LEXIS 69254, at *6 (N.D. Ohio July 12, 2010) (noting that Justice Stevens was "the crucial fifth vote in *Shady Grove*" and treating his concurrence as controlling).

Applying Justice Stevens's approach, this court finds that the class-action limitation contained in the TCPA is so intertwined with that statute's rights and remedies that it functions to define the scope of the substantive rights. Unlike in *Shady Grove*, the limitation here is contained in the substantive statute itself, not in a separate procedural rule. The very statutory provision that authorizes a private right of action for a violation of the TCPA limits such claims to those brought "individually." Tenn. Code Ann. § 47-18-109(a)(1). In addition, as explained by the Tennessee Supreme Court, the class-action limitation reflects a policy that the proper remedy for a violation affecting a class of consumers is prosecution by the Attorney General or by the Tennessee Department of Commerce and Insurance – not a private class action. *Walker*, 249 S.W.3d at 311. Because the restriction is a part of Tennessee's framework of substantive rights and remedies, Rule 23 does not apply.[8]

---

[8] This court is not the first to reach this conclusion in the context of a consumer protection statute. In *In re Whirlpool Corp.*, the District Court for the Northern District of Ohio applied *Shady Grove* to a consumer protection statute providing that a plaintiff "may, in an individual action," recover damages. Ohio Rev. Code Ann. § 1345.09(A). The court concluded that this limitation defined the relevant substantive rights and remedies, making Rule 23

20

Accordingly, the plaintiffs may not maintain their TCPA claim on behalf of the putative class, and the court will strike the class allegations relevant to that claim.

## CONCLUSION

For all of the reasons discussed above, the defendant's Motion to Strike Class Allegations and to Dismiss will be granted in part and denied in part.  The court will dismiss the plaintiffs' express warranty claim and will strike the class allegations relating to their TCPA claim.

An appropriate order will enter.

_____
ALETA A. TRAUGER
United States District Judge

---

inapplicable.  *In re Whirlpool Corp.*, 2010 U.S. Dist. LEXIS 69254, at \*6-7.

21