UNITED STATES DISTRICT COURT
MIDDLE DISTRICT OF TENNESSEE
NASHVILLE DIVISION

| | |
|---|---|
| **JAMES BEARDEN**, *et al.*, ) | |
| ) | |
| Plaintiffs, ) | |
| v. ) | No. 3:09-cv-1035 |
| ) | Judge Sharp |
| **HONEYWEEL INTERNATIONAL, INC.**,) | |
| ) | |
| Defendant. ) | |

## MEMORANDUM

Pending before the Court are Defendant's *Motion for Summary Judgment* (Docket Entry No. 289) and Plaintiff's *Motion for Partial Summary Judgment* (Docket Entry No. 305). The motions have been fully briefed by the parties.[1]

## RELEVANT FACTS AND PROCEDURAL HISTORY

On May 8, 2008, Plaintiffs James and Sheila Bearden ("Plaintiffs" or the "Beardens") moved into a newly constructed home in Nashville, Tennessee.[2] Two model F300 electronic air cleaners, manufactured by Defendant Honeywell International Inc. ("Defendant" or "Honeywell"), were installed in the house's heating system. Plaintiffs did not purchase the units directly from Honeywell. Rather, they were purchased from and installed by Daryl Bennett ("Bennett") of Lebanon Heating & Air Conditioning for $1,150.00. Plaintiffs did not review any Honeywell product literature before purchasing the F300 units. Instead, they relied solely on Bennett to convey any necessary information.

---

[1] The parties also filed motions to exclude certain experts in this case. *See* (Docket Entry Nos. 299, 301, 303). That opinion, which denies said motions, will be entered simultaneously with this Memorandum Opinion.

[2] Unless otherwise noted, the facts are drawn from the parties' statements of material facts and related declarations and exhibits. Based upon the record, the specific facts set forth in this Court's summary appear to be a fair characterization of the facts relevant to the issues presented in the filings.

When Bennett recommends a product like the Honeywell F300 unit to a customer, the most important thing to him is how the product has performed for his other customers in the past. Bennett recommended Honeywell F300 units to the Beardens because he had many happy customers previously and had a good track record with Honeywell products generally. Based on his previous customers' experiences, Bennett believed that Honeywell F300 units were a good choice for the Beardens.

The Beardens, however, soon discovered the units were not ideal for them. According to Plaintiffs, within days of moving in, Sheila Bearden ("S. Bearden") developed a respiratory illness. Over the next several months, she suffered sore throats, coughing, fatigue, and other troubling symptoms. She saw multiple doctors, but their diagnoses and treatments were ineffective.

On or around November 18, 2008, while searching for information about air contaminants, James Bearden ("J. Bearden") read that electronic air cleaners can contribute to poor indoor air quality. At that point, Plaintiffs permanently turned off their air cleaners. S. Bearden's health problems continued, however, and she and her husband were forced to move out of their house for several months. S. Bearden decided to have the Beardens' Honeywell F300 units entirely removed from service in the home in 2009. S. Bearden lived in her home with Honeywell F300 units running only for a six and one-half month period. According to Plaintiffs, S. Bearden's health problems were caused by ozone.

Bennett knew, when he recommended F300 units to the Beardens, that F300 units emitted ozone. The specific amount of ozone generated by Honeywell F300 units was not important to Bennett for his recommendation of those units to the Beardens. (Bennett Dep. at pp. 33-34). Nevertheless, Bennett expected Honeywell to accurately inform him of the safety of

the device. He never would have recommended the air cleaners had he known that Honeywell had misrepresented the ozone levels generated by the air cleaners; further, after learning of the Bearden's problems, Bennett never again sold another F300 air cleaner. (*Id*. at pp. 68-82).

Honeywell supplies an Owner's Guide document for F300 units. The Honeywell F300 Owner's Guide discloses that F300 units emit some ozone. The Honeywell F300 Owner's Guide states that "[e]lectronic air cleaners generate a very small amount of ozone, about 0.005 to 0.010 parts per million (ppm)." This equals 5 to 10 parts per billion (ppb). The document also notes that "[t]he U.S. Food and Drug Administration and Health and Welfare Canada recommend that indoor ozone concentration should not exceed .050 ppm," or 50 ppb. (*Id.*).

Ozone exists everywhere. Ozone is always present in the ambient air. Ozone exists indoors in the ambient air and would be present in the Beardens' home without the Honeywell F300 units. Plaintiffs continue to have ozone in their home even though the Honeywell F300 units have been turned off. Ozone exists in the air outdoors. For example in Nashville, Tennessee, where Plaintiffs live, historical data shows outdoor ozone levels averaging 40 ppb from April to September. Ozone levels in Nashville may occasionally reach 100 ppb.

Whole-house electronic air cleaners such as the F300 clean and filter the air by capturing airborne particles that pass through the air cleaner. The F300 includes electronic cells that use electricity to charge the particles in the air so that they may be collected by collector plates with an opposite electric charge. When electricity interacts with oxygen, ozone can be created as an incidental byproduct. Therefore, Honeywell discloses in its product literature that F300 air cleaners may produce some ozone during operation.

The parties' experts conducted testing of Plaintiffs' air cleaners in January and April, 2013. On January 23 and 24, 2013, Plaintiffs' expert, Patrick Rafferty ("Rafferty"), measured

ozone concentrations in the Beardens' home, and David MacIntosh (MacIntosh"), retained by Honeywell, conducted additional testing in the Beardens' home on April 9, 10, and 11, 2013. The Beardens' home, like all others, contains sources of ozone other than their air cleaners. (S. Bearden Dep. at 256:22–25, 279:25–280:22). In order to measure ozone contributed to the air by an F300 air cleaner, both Plaintiffs' and Honeywell's experts took "background" (or "baseline") measurements without the air cleaners operating. The background measurements are later subtracted from the ozone levels observed while the air cleaners are operating. (Rafferty Dep. at 10–11). This methodology attempts to isolate the ozone contributed by the air cleaner versus the ozone contributed from other sources.

Honeywell F300 air cleaners can be operated with the HVAC system either in the "ON" mode or the "AUTO" mode. (ECF No. 39-1 at 4.) Plaintiffs ran their F300 air cleaners in the "ON" mode from May 7, 2008 until about May 17, 2008 and from October 23, 2008 until about November 18, 2008 (about 36 days total). (J. Bearden Dep. at 68:12–70:18) (Mintzer Decl. Ex. 1); (S. Bearden Dep. at 76:7–77:5, 258:10–13, 342:1–343:11). Plaintiffs ran their air cleaners in the "AUTO" mode from about May 17, 2008 until October 23, 2008 (about 159 days).

Plaintiffs' industrial hygienist, Rafferty, observed ozone concentrations in the Beardens' home with the F300 air cleaners operating only in the "on" mode. Rafferty measured ozone concentrations in two rooms (master bathroom and retreat) of Plaintiffs' home. One of Plaintiffs' air cleaners served the east side of Plaintiffs' home, and the other air cleaner served the west side of Plaintiffs' home. Rafferty tested ozone from only the air cleaner serving the west side of the home. For the air cleaner serving the east side of Plaintiffs' home, Rafferty did not obtain any ozone measurements. In order to measure ozone present in the ambient air in Plaintiffs' home, Rafferty took background measurements without the air cleaners operating.

Rafferty subtracted his background ozone measurements from the ozone levels he later observed while the air cleaners were operating in the home.

Rafferty reported a peak ozone level of 19.1 ppb with Plaintiffs' air cleaners operating continuously, without accounting for background ozone levels. Rafferty measured background ozone levels in Plaintiffs' home ranging from 0.2 ppb to 2.6 ppb without the air cleaners operating. Rafferty calculated average background levels of 1.3 ppb in Plaintiffs' home. Removing an average background ozone level of 1.3 ppb, Rafferty observed ozone levels in Plaintiffs' retreat ranging from 1.6 to 14.3 ppb. Removing an average background ozone level of 1.3 ppb, Rafferty observed ozone levels in Plaintiffs' master bathroom ranging from 4.1 to 17.8 ppb.

Honeywell's expert, MacIntosh, also an industrial hygienist observed ozone levels in Plaintiffs' home with the air cleaners operating in "auto" mode. MacIntosh chose not to test the Beardens' air cleaners when they were running continuously. MacIntosh tested the ozone in the Beardens' home while the air cleaners were on "auto" or "intermittent" mode, whereby they would operate only if the HVAC system was put into operation by the Beardens' thermostat. The ozone measurements from Plaintiffs' home that MacIntosh obtained with the air cleaners running in "auto" mode all were below 10 ppb. MacIntosh observed during his testing of ozone levels in Plaintiffs' home that the background-corrected, eight-hour average ozone concentrations with the air cleaners running in "auto" mode all fell below 1 ppb.

MacIntosh performed additional analysis to determine what ozone levels may have been present in Plaintiffs' home during the period they lived there during 2008. He weighed the testing results obtained by Mr. Rafferty based on the amount of time Plaintiffs ran their air cleaners in the "on" mode and the time they ran them in the "auto." MacIntosh concluded that,

5

while Plaintiffs lived in their home, the average ozone concentrations attributable to the air cleaners would have been 3.1 ppb in the retreat and 4.2 ppb in the master bathroom.

S. Bearden has been examined by numerous doctors. She has had comprehensive neurological and respiratory evaluations and has undergone numerous objective medical tests to determine whether she has an injury. All tests have returned within the normal range. Plaintiff ultimately designated Dr. Richard Parent, a toxicologist, to evaluate whether the ozone from Plaintiffs' air cleaners caused S. Bearden respiratory health effects. Parent concluded, in relevant part,

> Mrs. Bearden's exposure to ozone and its reaction products has obviously had significant health effects as indicated by her development of a variety of respiratory symptoms not apparently evident in her pre-exposure medical records. Since her symptoms did not pre-exist her exposure in her new house, one can conclude that they are related to her exposure to her house environment which included exposure to ozone and its many reaction products produced by reaction with ozone. The symptoms that she experienced are consistent with upper respiratory irritation caused by ozone and its reaction products at concentration levels that were actually measured in her house.
>
> I therefore opine that ozone is not only capable of damaging epithelial tissue of the upper airways but is also capable of reacting with various household chemicals resulting in a number of toxicants capable of causing respiratory damage and allergic reactions in those exposed. I also opine that air purification equipment such as the Honeywell F300 Air Cleaners installed in the Bearden's house are capable of producing concentrations of ozone that can cause significant health effects by direct exposure to ozone and its reaction products.
>
> I further opine that it is more probable than not that Mrs. Bearden has suffered respiratory health effects including chronic cough, bronchitis, burning throat and sinuses, hoarseness, and sensitivity to smells as a result of her exposure to her ozonecontaminated house for a period of six months.

(Docket Entry No. 292-14, Parent Expert Report).

# ANALYSIS

## I. Summary Judgment Standard

A party may obtain summary judgment if the evidence establishes there are not any genuine issues of material fact for trial and the moving party is entitled to judgment as a matter of law. *See* Fed. R. Civ. P. 56(c); *Covington v. Knox County School Sys.*, 205 F.3d 912, 914 (6th Cir. 2000). The moving party bears the initial burden of satisfying the court that the standards of Rule 56 have been met. *See Martin v. Kelley*, 803 F.2d 236, 239 n.4 (6th Cir. 1986). The ultimate question to be addressed is whether there exists any genuine issue of material fact that is disputed. *See Anderson v. Liberty Lobby*, 477 U.S. 242, 248 (1986); *Covington*, 205 F.3d at 914 (citing *Celotex Corp. v. Catrett*, 477 U.S. 317, 325 (1986)). If so, summary judgment is inappropriate.

To defeat a properly supported motion for summary judgment, the nonmoving party must set forth specific facts showing that there is a genuine issue of material fact for trial. If the party does not so respond, summary judgment will be entered if appropriate. Fed. R. Civ. P. 56(e). The nonmoving party's burden of providing specific facts demonstrating that there remains a genuine issue of material fact for trial is triggered once the moving party shows an absence of evidence to support the nonmoving party's case. *Celotex*, 477 U.S. at 325. A genuine issue exists "if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Anderson*, 477 U.S. at 248. In ruling on a motion for summary judgment, the Court must construe the evidence in the light most favorable to the nonmoving party, drawing all justifiable inferences in its favor. *See Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986).

The standard remains the same when both parties move for summary judgment. *Taft Broad. Co. v. United States,* 929 F.2d 240, 248 (6th Cir. 1991). "When reviewing cross-motions for summary judgment, the court must evaluate each motion on its own merits and view all facts and inferences in the light most favorable to the nonmoving party." *Wiley v. United States (In re Wiley),* 20 F.3d 222, 224 (6th Cir. 1994).

## II. Honeywell's Motion for Summary Judgment

### A. Fraud Claims

Plaintiffs have brought claims against Defendant for fraud, fraudulent concealment, and negligent misrepresentation. Defendant insists Plaintiffs' fraud claims fail because Honeywell did not materially misrepresent the amount of ozone its air cleaners produce. (Docket Entry No. 290 at 16). In fact, Defendant contends Plaintiffs' own expert testing demonstrates this point − "when properly averaged and accounting for maximum background, [the testing] shows that Honeywell accurately disclosed that Plaintiffs' air cleaners contribute about 5−10 ppb ozone to the indoor air . . ." (*Id.*). Defendant continues, "[s]imply put, Plaintiffs cannot establish a material misrepresentation required to sustain their claims of fraud and negligent misrepresentation." (*Id.*).

Plaintiffs counter, however, Rafferty's testing confirming their air cleaners produced more ozone in their home is not the only evidence of Honeywell's misrepresentations. (Docket Entry No. 325 at 7). To the contrary, Rafferty's results "are only the latest entry in an extensive catalogue of evidence establishing [this contention]." (*Id.*). According to Plaintiffs, in 2003 Honeywell engineers conducted an extensive testing of "the very air cleaners in this litigation

8

and generated finding eerily consistent with those found by [Rafferty]."[3] (*Id*. at 8). Under Tennessee law, a plaintiff must establish four elements to prove fraud:

> (1) an intentional misrepresentation with regard to a material fact; (2) knowledge of the representation's falsity (i.e., it was made "knowingly" or "without belief in its truth," or "recklessly" without regard to its truth or falsity); (3) the plaintiff reasonably relied on the misrepresentation and suffered damage; and (4) the misrepresentation relates to an existing or past fact, or, if the claim is based on promissory fraud, the misrepresentation "must embody a promise of future action without the present intention to carry out the promise.

*McMillin v. Lincoln Mem'l Univ.,* No. E2010–01190–COA–R3–CV, 2011 WL 1662544, at *5 (Tenn.Ct.App. May 3, 2011) (quoting *Shahrdar v. Global Hous., Inc.,* 983 S.W.2d 230, 237 (Tenn.Ct.App. 1998)); *accord Carter v. Patrick,* 163 S.W.3d 69, 77 (Tenn.Ct.App. 2004) (citing *Stacks v. Saunders,* 812 S.W.2d 587, 592 (Tenn.Ct.App. 1990). A claim for negligent misrepresentation is established if the plaintiff demonstrates (1) that the defendant supplied information to the plaintiff, (2) that this information was false, (3) that the defendant "did not exercise reasonable care in obtaining or communicating the information," and (4) that the plaintiff "justifiably relied on the information." *Walker,* 249 S.W.3d at 311; *see also Menuskin v. Williams,* 145 F.3d 755, 762–63 (6th Cir.1998) (citing *John Martin Co. v. Morse/Diesel, Inc.,*

---

[3] According to Plaintiffs,

> "the test results indicated that RP 5000 [a competitor's air cleaner] produces minimal, .003 ppm., compared to the F-50F [equivalent to the F300] **.20 plus ppm. Even with the F-50F in low ozone setting***, the F-50F produces five times the ozone as the RP5000, .015ppm.*" (Bartlett Depo., Ex. E at 142:19-25)(emphasis supplied). These findings are consistent with testing conducted by Honeywell in Minneapolis homes in 2002, which found that the air cleaners generated peak concentrations in five of six test homes well in excess of 10 ppb over background, and average concentrations in two homes that were 14 ppb and 24 ppb over background. (Rafferty Report, Ex. B at 5). Plaintiffs' test results from the Beardens' home are also consistent with testing in a Toronto home by the Canadian Mortgage Housing Corporation, during which "bedroom levels reached 30 ppb and the experiment was discontinued when the asthmatic occupant of the home experienced airway restriction requiring medication." (Rafferty Report, Ex. B at 4)."

(*Id.*).

819 S.W.2d 428, 431 (Tenn. 1991)). As with a claim for intentional misrepresentation, a negligent misrepresentation must relate to a material past or existing fact. *See Gleason v. Freeman,* No. 06–2443–JPM/TMP, 2008 WL 2485607, *4, 2008 U.S. Dist. LEXIS 52304, at *12 (W.D.Tenn. June 17, 2008); *McElroy v. Boise Cascade Corp.,* 632 S.W.2d 127, 130 (Tenn.Ct.App. 1982).

As to fraudulent concealment, Defendant claims Plaintiffs cannot establish a duty to disclose. (Docket Entry No. 290 at 20). In Tennessee, "the tort of fraudulent concealment is committed when a party who has a duty to disclose a known fact or condition fails to do so, and another party reasonably relies upon the resulting misrepresentation, thereby suffering injury." *Shah v. Racetrac Petroleum Co.,* 338 F.3d 557, 571 (6th Cir. 2003) (quoting *Chrisman v. Hill Home Dev., Inc.* 978 S.W.2d 535, 538–39 (Tenn. 1998)). The Sixth Circuit has stated:

> The duty to disclose arises in three distinct circumstances: (1) "where there is a previous definite fiduciary relation between the parties," (2) "where it appears one or each of the parties to the contract expressly reposes a trust and confidence in the other," and (3) "where the contract or transaction is intrinsically fiduciary and calls for perfect good faith."

*Id.* (quoting *Domestic Sewing Mach. Co. v. Jackson,* 83 Tenn. 418, 425 (1885)). Defendant claims that it had no duty to disclose because "Honeywell's statements about ozone and health are not misleading, there was no "dangerous" condition to disclose, and there was no "basis, material information" that [it] withheld."

Fundamentally, Plaintiffs' entire case hinges on whether Defendant made a misrepresentation as to the amount of ozone emitted from the Honeywell F300 air cleaners. And the experts come to entirely dissimilar conclusions as to this subject. "Competing expert opinions present the 'classic battle of the experts and it is up to a jury to evaluate what weight and credibility each expert opinion deserves. *Phillips v. Cohen,* 400 F.3d 388, 399 (6th Cir.

2005) (quoting *Cadmus v. Aetna Cas. & Sur. Co.,* No. 95–5721, 1996 U.S.App. LEXIS 29443, at *6 (6th Cir. Nov. 7, 1996)). This appears to be a battle of the experts, and the Court finds this statement of law to be applicable in this instance. Therefore, the issue of misrepresentation is a question that remains for the jury.[4]

Next, Defendant contends, even if Plaintiffs could show that the Honeywell air cleaners produce more ozone than stated in its product literature, which they cannot, summary judgment should be granted because neither the Beardens nor their HVAC contractor relied on Honeywell's statement regarding the amount of ozone the air cleaners produce. (Docket Entry No. 290 at 1). Plaintiffs, however, counter,

> Honeywell's argument is based on a handful of leading questions all of which were designed to get Mr. Bennett, who stated that he read the Honeywell product guide and other materials associated with the F300, to assent to statements to the effect that "[t]he specific amount of ozone generated by the F300's was not important to you in recommending the F300's to the Beardens. Is that true?" (Honeywell Memo. at 23 (quoting Bennett Depo, Ex. D at 33:4-15)). Honeywell omits mention of the objection made by Plaintiffs' counsel to the questions that have been reprinted in Honeywell's Motion; all were leading and would be entirely inadmissible at trial. But Plaintiffs do not seek to defeat Honeywell's reliance argument solely on the basis that it does not comport with the Rules of Evidence. Rather, Plaintiff would submit for this Court's evaluation Mr. Bennett's testimony regarding his reliance on Honeywell to provide accurate information in its literature and to inform him of health issues relating to the ozone produced by its F300 air cleaners. Mr. Bennett's specific testimony about his reliance, which goes entirely unmentioned in Honeywell's Motion, makes it clear that summary judgment with respect to reliance is a non-starter:
>
> Q (By Mr. Stewart): Would – was it your assumption in dealing with the F300 product guide that the statements in it were true and accurate?
> A: Yeah.
>
> Q: Would you have been surprised to find that there were statements in the

---

[4] Plaintiffs also brought a claim under the Magnuson-Moss Warranty Act (the "Act"), 15 U.S.C. § 2301 *et seq.* Defendant argues the Court should dismiss the claim as it did in *Rehberger* because Plaintiffs did not read any warranty. (Docket Entry No. 290 at 25). In a footnote, Plaintiffs concede this proposition, stating, "This Court has ruled on the Rehbergers' Magnusson-Moss Act claims and while Plaintiffs take issue with this Court's reasoning, they concede that it applies with equal force to the MMA claims by the Beardens." (Docket Entry No. 325, fn 1). Therefore, this claim will be dismissed.

product guide that were not true?
A: Yes.

Q: Would it surprise you to find that there were statements in this product guide that we are looking at now that were inaccurate?
Mr. Pfeiffer: Object to form.
A: Yes.

Q: You would rely on – on a product guide to be true and accurate?
A: That's correct.

\*\*\*

Mr. Bennett further testified that when, after hearing about the Beardens' problems with the F300, he contacted Honeywell, providing the company yet another opportunity to correct the false statements and omissions in its literature. (*Id.*, at 71:22-72:23).

(Docket Entry No. 325 at 14-16).

When considering the evidence in the light most favorable to the non-moving party, the Court finds this is enough to support a claim that Plaintiffs, indirectly through the contractor, relied on Defendant's affirmative statements. The jury is certainly entitled to weigh such testimony and even to disregard it, but such weighing of evidence must be left to the trier of fact. Accordingly, the Court will deny summary judgment as to Plaintiffs' fraud claims.[5]

**B. Unjust Enrichment Claim**

Plaintiffs contend that Defendant has been unjustly enriched by retaining the economic benefit it received from the F300 sales. "The elements of an unjust enrichment claim are: 1) '[a] benefit conferred upon the defendant by the plaintiff'; 2) 'appreciation by the defendant of such benefit'; and 3) 'acceptance of such benefit under such circumstances that it would be inequitable for him to retain the benefit without payment of the value thereof.' " *Freeman*

---

[5] As to fraudulent concealment, Defendant claims that Plaintiffs cannot establish a duty to disclose. (Docket Entry No. 290 at 20). With the issue of whether Defendant knew of the "known fact or condition" being a question of fact, this claim also must be left to the jury.

*Indus., LLC v. Eastman Chem. Co.,* 172 S.W.3d 512, 525 (Tenn. 2005) (quoting *Paschall's, Inc. v. Dozier,* 219 Tenn. 45, 407 S.W.2d 150, 155 (1966)); *accord Hood Land Trust v. Hastings,* No. M2009–02625–COA–R3–CV, 2010 WL 3928647, at *6 (Tenn.Ct.App. Oct. 5, 2010). "The remedy for unjust enrichment requires that the person who has been unjustly enriched at the expense of another make restitution to that person." *Chase Manhattan Bank, N.A. v. CVE, Inc.,* 206 F.Supp.2d 900, 909 (M.D.Tenn. 2002) (citing *Browder v. Hite,* 602 S.W.2d 489, 491 (Tenn.Ct.App.1980)).

Defendant claims the "lack of a material misrepresentation also means Plaintiffs cannot prevail" on the unjust enrichment claim. (Docket Entry No. 290 at 22). Furthermore, Plaintiffs cannot establish unjust enrichment because they have not exhausted their remedies against their contractor. (*Id.* at 27). Plaintiffs argue they "need not sure Darryl Bennett to obtain relief from Honeywell's unjust enrichment." (Docket Entry No. 325 at 10). Citing *Freeman Indus., LLC v Eastman Chemical Co*., 172 S.W.3d 512, 526 (Tenn. 2005), Plaintiffs contends "to maintain an action for unjust enrichment, a plaintiff is not required to exhaust all remedies against the party with whom the plaintiff is in privity if the pursuit of the remedies would be futile." (Docket Entry No. 325 at 19).

The Court finds that Plaintiffs' bare allegation and reference to *Freeman*, without providing a factual basis to support the contention, is not sufficient to establish a disputed issue of material fact as to the exhaustion-of-remedies element of *Freeman.* Further, there is no evidence in the record that Plaintiffs attempted to obtain a refund, and if so, that Lebanon Heating & Air Conditioning refused to provide one. Therefore, this claim will be dismissed.

13

## C. TCPA Claim

Similar to the above claims, Defendant asserts Plaintiffs' claim for violation of the Tennessee Consumer Protection Act should be dismissed because a TCPA claim "again depends on alleged misrepresentations by Honeywell." (Docket Entry No. 290 at 21).[6] As Plaintiffs' allegation that the air cleaners emit dangerous level of ozone is false, insists Defendant, they do not have sufficient evidence to create a genuine issue as to its truth. (*Id.*). Therefore, according to Defendants, Plaintiffs cannot establish a "deceptive act" under the TCPA. (*Id.*). Additionally, Defendant claims Plaintiffs have failed to demonstrate that "the alleged unfair practice proximately caused their damages." (*Id.* at 24).

"The Tennessee Consumer Protection Act, Tennessee Code Annotated Sections 47–18–101 *et seq.* ('TCPA'), prohibits, among other things, 'unfair or deceptive acts or practices affecting the conduct of any trade or commerce' Tenn. Code Ann. § 47–18–104(a),' " and characterizes "[a] 'deceptive' act or practice [a]s 'one that causes or tends to cause a consumer to believe what is false or that misleads or tends to mislead a consumer as a matter of fact.' " *Borla Performance Indus., Inc. v. Universal Tool & Eng., Inc.,* 2015 WL 3381293, at *13–14 (Tenn.Ct.App. May 26, 2015) (quoting *Tucker v. Sierra Builders,* 180 S.W.3d 109, 116 (Tenn.Ct.App. 2005)). In order to recover under the TCPA, Plaintiffs must prove: (1) that Honeywell engaged in an unfair or deceptive act or practice declared to be unlawful by the TCPA; and (2) that Honeywell's conduct caused an "ascertainable loss of money or property,

---

[6] Plaintiffs have filed a motion seeking summary judgment of their claim under the TCPA "because undisputed evidence establishes that Honeywell misrepresented the amount of ozone generated by their air cleaners – a deceptive act under the TCPA." (Docket Entry No. 305 at 1). Moreover, Plaintiffs contend Honeywell has misled consumers by concealing at least two types of material information – first, that a percentage of the population are highly sensitive to ozone and cannot tolerate the ozone generated by Honeywell air cleaners and second, that the levels generated by those devices subject customers to an increased risk of death. (*Id.* at 24-25).

real, personal or mixed, or any other article, commodity, or thing of value wherever situated." Tenn. Code Ann. § 47–18–109(a)(1).

As stated *supra*, the evidence presented in the record, when construed in a light most favorable to Plaintiffs, creates a genuine issue of material fact as to proximate cause for the TCPA claim. Thus, summary judgment on this claim is not proper at this time. Likewise, Plaintiff's partial motion in this regard will be denied as well.

### D. Strict Liability and Negligent Failure to Warn Claims

Under the Tennessee Products Liability Act of 1978, a products liability action includes all actions based upon the following theories, among others: strict liability in tort, negligence, and failure to warn. Tenn.Code Ann. § 29–28–102(6). A manufacturer or seller of a product shall not be liable for any injury caused by the product unless the product is determined to be in a defective condition or unreasonably dangerous at the time it left the control of the manufacturer or seller. Tenn.Code Ann. § 29–28–105(a). Compliance by a manufacturer or seller with any federal or state statute or administrative regulation existing at the time a product was manufactured and prescribing standards for design, inspection, testing, manufacture, labeling, warning or instructions for use of a product, shall raise a rebuttable presumption that the product is not in an unreasonably dangerous condition in regard to those matters covered by these standards. Tenn.Code Ann. § 29–28–104(a).

Besides showing a defective or unreasonably dangerous condition, a products liability plaintiff must always prove that the unreasonably dangerous or defective condition was the proximate cause of his injury. *Davis v. Komatsu America Industries Corp.,* 46 F.Supp.2d 745, 751 (W.D.Tenn. 1999), *disagreed with on other grounds, Nye v. Bayer Cropscience, Inc.,* 347 S.W.3d 686 (Tenn. 2011). The issue of proximate cause is one for the factfinder to determine,

unless the facts and the inferences to be drawn therefrom are beyond all reasonable dispute. *Davis,* 46 F.Supp.2d at 751.

"Under Tennessee law, a manufacturer must warn users about non-obvious dangers caused by its product." *Rodriguez v. Stryker Corp.,* 680 F.3d 568, 570 (6th Cir. 2012). "A reasonable warning not only conveys a fair indication of the dangers involved, but also warns with the degree of intensity required by the nature of the risk." *Pittman v. Upjohn Co.,* 890 S.W.2d 425, 429 (Tenn. 1994). The Tennessee Supreme Court has identified an inclusive list of criteria for identifying an adequate warning: 1) the warning must adequately indicate the scope of the danger; 2) the warning must reasonably communicate the extent or seriousness of the harm that could result from misuse of the product; 3) the physical aspects of the warning must be adequate to alert a reasonably prudent person to the danger; 4) a simple directive warning may be inadequate when it fails to indicate the consequences that might result from a failure to follow it; and 5) the means to convey the warning must be adequate. *Barnes v. Kerr Corp.,* 418 F.3d 583, 590 (6th Cir. 2005) (citing *Pittman,* 890 S.W.2d at 429). "An action based on an inadequate warning requires not only that the warning itself be defective, but that the plaintiff establish that the product is unreasonably dangerous by reason of defective warning and that the inadequate labelling proximately caused the claimed injury." *Id.* (internal quotation marks and alteration marks omitted). "Generally, a manufacturer will be absolved of liability for failure to warn for lack of causation where the consumer was already aware of the danger, because the failure to warn cannot be the proximate cause of the user's injury if the user had actual knowledge of the hazards in question." *Harden v. Danek Med., Inc.,* 985 S.W.2d 449, 451 (Tenn.Ct.App. 1998) (internal quotation marks omitted).

Defendant purports that Dr. Parent's testimony regarding S. Bearden's injuries cannot establish a genuine issue of material fact on physical causation for their claims of strict liability and negligent failure to warn. The Court disagrees. Rather, the Court finds the parties' competing views on S. Bearden's injuries is a classic scientific dispute, which does create a genuine issue of material fact. Defendant may demonstrate the alleged deficiencies to the trier of fact through rigorous cross-examination. The jury should be permitted to hear the testimony and determine which expert's opinion is entitled to more weight. Accordingly, the motion will be denied as to these claims.[7]

## CONCLUSION

For all of the reasons stated, the Court will grant in part and deny in part Defendant's *Motion for Summary Judgment* (Docket Entry No. 289). The Court will grant the motion with respect to Plaintiffs' unjust enrichment claim as well as their claim brought under the Magnuson-Moss Warranty Act brought. The Court will deny the motion with respect to Plaintiffs' remaining claims.

The Court will also deny Plaintiffs' *Motion for Partial Summary Judgment* (Docket Entry No. 305).

An appropriate Order shall be entered.

_____
KEVIN H. SHARP
UNITED STATES DISTRICT JUDGE

---

[7] Defendant has also moved for summary judgment on the issue of economic and non-economic damages. It is undetermined at this time whether Plaintiffs will prove their damages. Therefore, the Court denies Defendant's request for summary judgment on the issue of damages.